STATE OF NORTH CAROLINA v. QUINTEL AUGUSTINE

No. 130A03

(Filed 19 August 2005)

## 1. Jury— selection—*Batson* challenge—prima facie showing

The trial court did not err by ruling that a first-degree murder defendant had not made a prima facie showing of racial discrimination in a *Batson* challenge to the State's peremptory challenge of a prospective juror. Numerous factors support the trial court's ruling.

## 2. Evidence— incidents of prior misconduct—no prejudice

There was no plain error in a first-degree murder prosecution where the court allowed the prosecutor to cross-examine defendant about twenty-two alleged incidents of prior misconduct, consisting of nineteen alleged incidents involving law enforcement and corrections officers and three alleged assaults against civilians. It cannot be said that the cross-examination amounted to a miscarriage of justice or denied defendant a fundamental right.

## 3. Constitutional Law— effective assistance of counsel—failure to object—no prejudice

Defendant had effective assistance of counsel even though his attorney did not object to questions about defendant's twenty-two alleged prior instances of wrongdoing or request a limiting instruction. In light of compelling evidence of defendant's guilt, including the testimony of three eyewitnesses identifying defendant, there is no reasonable probability that defense counsel's failure to object to the alleged errors and to request a limiting instruction deprived defendant of a fair trial with a reliable result. The assignment of error is overruled and defendant's MAR on appeal is denied.

## 4. Evidence— events after shooting—defendant's violent character—explanation of conduct

The trial court did not err in a first-degree murder prosecution by admitting testimony about events after the shooting which defendant contended portrayed him as a violent and dangerous man. Even assuming that defendant did not waive his objection, the evidence was relevant to show that the witness fled after the shooting to assist his frightened girlfriend and chil-

dren, rather than because the witness was guilty as defendant suggested.

**5. Criminal Law— prosecutor's closing arguments—defendant's ill will toward law enforcement**

The trial court did not err by failing to intervene ex mero motu during the prosecutor's closing arguments in a first-degree murder trial where the State's arguments were based on the evidence of defendant's ill will toward law enforcement and appropriate inferences from that evidence and were relevant to defendant's motive for shooting an officer.

**6. Criminal Law— prosecutor's argument—credibility of defense witness**

The trial court did not err by not intervening ex mero motu in a first-degree murder prosecution where the State argued that a defense witness was not credible. The witness's credibility was fair game because he implicated someone other than defendant as the shooter and the prosecutor's closing arguments highlighted facts in evidence and reasonable inferences therefrom. Moreover, defendant failed to demonstrate prejudice.

**7. Constitutional Law— effective assistance of counsel—decisions not grossly improper**

Defendant did not demonstrate that his counsel's failure to object to certain closing arguments by the prosecution fell below an objective standard of reasonableness, or that a reasonable probability exists of a different result, where the arguments were not so grossly improper as to require intervention by the trial court ex mero motu.

**8. Criminal Law— request for instruction—not submitted in writing—given in substance**

The trial court did not err by denying a first-degree murder defendant's oral request for a special jury instruction on the credibility of a prosecution witness where defendant did not submit a pertinent proposed written instruction. Moreover, the transcript indicates that defense counsel's real interest was that the jury should have the opportunity to determine whether the witness's desire to avoid prosecution as a habitual felon motivated him to testify for the State. This concern was captured in the pattern jury interested witness instruction given by the court.

**9. Evidence— capital sentencing—incident in jail—cumulative—not prejudicial in light of other evidence**

The trial court did not err by admitting during the sentencing phase of a capital trial evidence of an incident that occurred in the Cumberland County Jail while defendant was awaiting trial where defendant argues that the evidence was cumulative and used to "pad" the State's case to assuage any lingering concerns about defendant's culpability. In light of the other evidence presented in this case, there is no likelihood that the jury would have reached a different conclusion if it had not heard this evidence.

**10. Constitutional Law— effective assistance of counsel—statement during sentencing—trial strategy**

A first-degree murder defendant was not deprived of effective assistance of counsel where one of his attorneys made a statement during the sentencing proceeding closing arguments that defendant would feel no pain during an execution but that the pain would be felt by his family. The argument responded to the prosecution's victim-impact evidence and continued the theme that there had been enough suffering and defendant failed to establish that the challenged remark exceeded the wide latitude granted trial counsel in matters of strategy and closing argument.

**11. Criminal Law— prosecutor's argument—defendant's courtroom demeanor**

There was no abuse of discretion in a capital sentencing proceeding where the prosecutor's challenged remark that "there has been a total lack of remorse" was part of an argument that urged the jury to use its "common sense" in evaluating defendant's courtroom demeanor throughout the trial. Comments by the State concerning a defendant's courtroom conduct are permissible because the defendant's demeanor is before the jury at all times.

**12. Criminal Law— prosecutor's argument—despicable person**

Although ad hominem attacks on a witness or litigant are disapproved, the trial court did not err by failing to intervene ex mero motu in a capital sentencing proceeding when the prosecutor argued that the act in question was committed by a despicable human being.

STATE v. AUGUSTINE

[359 N.C. 709 (2005)]

### 13. Sentencing— capital—death penalty proportionate

A death sentence for the murder of a law enforcement officer was not disproportionate.

Justices BRADY and NEWBY did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Jack A. Thompson on 22 October 2002 in Superior Court, Brunswick County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 9 November 2004.

*Roy Cooper, Attorney General, by G. Patrick Murphy, Special Deputy Attorney General, for the State.*

*Staples S. Hughes, Appellate Defender, by Benjamin Dowling-Sendor, Assistant Appellate Defender, for defendant-appellant.*

EDMUNDS, Justice.

Defendant Quintel Augustine was indicted on 25 February 2002 for the killing of Fayetteville Police Officer Roy Gene Turner, Jr. Defendant was found guilty of first-degree murder on the basis of malice, premeditation and deliberation. Following a capital sentencing proceeding, the jury found that the mitigating circumstances were insufficient to outweigh the aggravating circumstance and recommended a sentence of death. The trial court entered judgment on 22 October 2002.

On 29 November 2001, Officer Roy Turner was assigned to patrol the Jasper Street area as a member of the Neighborhood Improvement Team (NIT). On the NIT with Officer Turner that night were Officer Stephen Tredwell and the supervisor, Sergeant Shanon Brewer.

Sergeant Brewer radioed Officers Tredwell and Turner and instructed them to meet him at a church on Amy Street. Officer Tredwell arrived at the church where he found Sergeant Brewer but not Officer Turner. After waiting approximately ten minutes, Sergeant Brewer again radioed Officer Turner, who responded that he was headed in that direction. When Officer Turner still did not appear, Officer Tredwell made two unsuccessful attempts to reach him by radio. Three minutes later, Sergeant Brewer and Officer Tredwell heard a dispatch that a Fayetteville police officer had been shot in

the vicinity of Moore and Hillsboro Streets, an area associated with drug activity, alcohol consumption, and domestic disputes.

Sergeant Brewer and Officer Tredwell immediately proceeded to the scene. There they saw Officer Turner's patrol car parked at an angle near the light pole at Moore and Hillsboro Streets. The head-lights were on and the engine was still running, but the blue lights had not been activated. Officer Turner was lying on the ground as other officers administered CPR. His weapon was strapped in its holster on the right side of his body. He had suffered a bullet wound to the right side of the head and the autopsy revealed that he had also been shot in the right front shoulder. Officer Turner was taken by ambulance to Cape Fear Valley Hospital where he was pronounced dead about an hour and a half later.

The State presented evidence that, at the time of the offense, four people, including defendant, were standing near a pay telephone booth at the intersection of Moore and Hillsboro Streets. Three of these individuals, Deldrick Devone Autry (Autry), James "Little D" Carlysle (Carlysle), and Lisa Merrick (Merrick), testified that the fourth, defendant Quintel Augustine, shot Officer Turner. According to this testimony, earlier in the evening of 29 November, defendant, Autry, Carlysle, and Merrick were hanging out with several others in the yard of a Ms. Swinson, who resided on Moore Street. They had been drinking alcohol and smoking marijuana for approximately an hour to an hour and a half when Ms. Swinson returned home from work and chased everyone away. The group crossed the street, where defendant told Autry that he was angry because his brother had "[got-ten] some time" and that he wanted to shoot a police officer. As the group slowly began to break up, defendant and Autry walked up Moore Street to a telephone booth. According to Autry, this telephone booth was the site of frequent drug sales. Carlysle and Merrick joined them about twenty minutes later.

Shortly thereafter, Officer Turner's marked police car approached from Ramsey Street and stopped where Moore intersected with Hillsboro Street. Officer Turner looked at the group briefly, then drove on across Hillsboro Street. However, when Merrick yelled an obscenity, Officer Turner turned his cruiser around, recrossed Hillsboro, and parked in front of the telephone booth. Officer Turner then exited the vehicle and began to approach the telephone booth. Autry first saw defendant fumbling with something in the waist of his pants, then heard a gunshot. As Officer Turner began to reach for his own weapon, Autry saw defendant shoot Officer Turner over the tele-

**STATE v. AUGUSTINE**

[359 N.C. 709 (2005)]

phone booth "a couple more times." Carlysle similarly testified that he saw defendant take a black pistol out of his pocket and cock it while the officer was still in his car. As Officer Turner emerged from his vehicle, defendant raised himself up on the telephone booth and fired three or four rounds at close range, causing the officer to fall to his knees. Merrick also testified that she saw defendant pull out a pistol, heard some shots, and saw defendant shoot the officer. Although the murder weapon was never found, three expended shell casings were recovered at the crime scene. Forensic examination indicated that all three had been fired in the same .380 caliber firearm. Additional examination established that two bullet fragments removed from Officer Turner's head and chest had been fired from a Hi-Point Firearms .380 caliber automatic handgun.

Defendant testified that he did not shoot Officer Turner. According to defendant, he never spoke to Autry about his brother being in prison or of having a desire to kill a police officer. Furthermore, Autry, not he, had been carrying a handgun earlier that evening. Defendant claimed to the investigating officers that the three witnesses implicated him because he "wasn't from that neighborhood" and they were trying to put the murder "off on [him]."

Additional facts will be set forth as necessary for the discussion of various issues.

## JURY SELECTION

[1] We first consider defendant's assignment of error pertaining to jury selection. Defendant contends that the trial court erred by ruling that he had not made a prima facie showing of racial discrimination at the time he objected to the State's peremptory challenge of prospective juror Ernestine Bryant. Ms. Bryant was the only African American in the first panel of twelve prospective jurors. When the State peremptorily challenged her, defendant raised an objection pursuant to *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986), arguing that Ms. Bryant was the first African-American prospective juror to be considered, that the number of African Americans who had been summoned for the jury pool in this case was small, and that Ms. Bryant had indicated during *voir dire* that she could consider both the death penalty and life imprisonment without parole as potential punishments in this case. The trial court confirmed that this peremptory challenge was the first exercised for a black female, then overruled the objection on the ground that defendant had made no prima facie showing of discrimination.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution forbids the State from using peremptory challenges for racially discriminatory reasons, *Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 83, as does Article I, Section 26 of the North Carolina Constitution, *State v. Nicholson*, 355 N.C. 1, 21, 558 S.E.2d 109, 124 (citing *State v. Fletcher*, 348 N.C. 292, 312, 500 S.E.2d 668, 680 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 113 (1999)), *cert. denied*, 537 U.S. 845, 154 L. Ed. 2d 71 (2002). In analyzing a claim that the State impermissibly excluded jurors on the basis of race, the United States Supreme Court established a three-part test in *Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, that has been adopted by this Court, *State v. Barden*, 356 N.C. 316, 342, 572 S.E.2d 108, 126 (2002) (citing *State v. Lawrence*, 352 N.C. 1, 13-14, 530 S.E.2d 807, 815-16 (2000), *cert. denied*, 531 U.S. 1083, 148 L. Ed. 2d 684 (2001)), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003). First, the defendant must establish a prima facie case that the State exercised a race-based peremptory challenge. *Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 87-88. If the defendant makes the requisite showing, the burden then shifts to the State to demonstrate a facially valid and race-neutral explanation for the peremptory challenge. *Id.* at 97-98, 90 L. Ed. 2d at 88. Finally, the trial court must determine whether the defendant has satisfied his burden and proved purposeful discrimination. *Id.* at 98, 90 L. Ed. 2d at 88-89.

Defendant's objection here implicates only the first prong of the test. "Generally, when a trial court rules that the defendant has failed to establish a *prima facie* case of discrimination, this Court's review is limited to a determination of whether the trial court erred in this respect." *State v. Bell*, 359 N.C. 1, 12, 603 S.E.2d 93, 102 (2004), *cert. denied*, —— U.S. ——, 161 L. Ed. 2d 1094 (2005). The trial court's ruling is accorded deference on review and will not be disturbed unless it is clearly erroneous. *Nicholson*, 355 N.C. at 21-22, 558 S.E.2d at 125.

This Court has utilized several factors in determining whether a defendant has made a prima facie showing that race played an impermissible part in the State's exercise of a peremptory challenge. Although the following list is not exhaustive, such factors and circumstances to be considered include: whether the State exercised a disproportionate number of peremptory challenges to strike African Americans in a single case; the races of the defendant, the victim, and the State's key witnesses; whether the prosecutor's own statements or questions posed to African-American prospective jurors appear

racially motivated and therefore raise an inference of discrimination; and the acceptance rate of African-American prospective jurors by the prosecution. *See, e.g., Barden,* 356 N.C. at 343, 572 S.E.2d at 127 (citing *State v. Quick,* 341 N.C. 141, 145, 462 S.E.2d 186, 189 (1995)); *Nicholson,* 355 N.C. at 22, 558 S.E.2d at 125; *State v. Smith,* 351 N.C. 251, 262-63, 524 S.E.2d 28, 37-38, *cert. denied,* 531 U.S. 862, 148 L. Ed. 2d 100 (2000); *State v. Gregory,* 340 N.C. 365, 397-98, 459 S.E.2d 638, 656-57 (1995), *cert. denied,* 517 U.S. 1108, 134 L. Ed. 2d 478 (1996).

When the State peremptorily challenged prospective juror Bryant, the trial court said to the prosecutor: "My recollection, that is the first peremptory challenge exercised for a black female, is that correct?" Defendant argues this question indicated that the court denied his objection only because Bryant was the first African American to be challenged. However, the record demonstrates that numerous factors support the trial court's ruling. This case, where defendant, the victim, and the State's three critical witnesses were all African American, was not particularly susceptible to racial discrimination. *See, e.g., Smith,* 351 N.C. at 263, 524 S.E.2d at 37. The State neither made any racially motivated statements nor asked any racially motivated questions of prospective juror Bryant. *Id.; Gregory,* 340 N.C. at 398, 459 S.E.2d at 657. When the State exercised a peremptory challenge against Bryant, it also peremptorily challenged prospective juror Carolyn Lambert, a Caucasian. In addition, the record shows that prospective juror Bryant's son was of comparable age to defendant and was serving a federal sentence in Kentucky for a drug offense. The trial court observed Bryant's answers concerning her son, and such responses from prospective jurors are pertinent to a determination of whether defendant has met his burden. *Nicholson,* 355 N.C. at 23, 558 S.E.2d at 126.

Upon consideration of all these factors, we conclude that defendant failed to make a prima facie showing of racial discrimination in the State's peremptory challenge of prospective juror Bryant and that the trial court did not err in overruling defendant's *Batson* objection. This assignment of error is overruled.

## GUILT-INNOCENCE PHASE

**[2]** Defendant argues that the trial court erred when it allowed the prosecutor to cross-examine him about twenty-two alleged incidents of prior misconduct, consisting of nineteen alleged incidents involving law enforcement and corrections officers and three alleged

assaults against civilians. Defendant contends that this cross-examination was not admissible under N.C.G.S. § 8C-1, Rule 404(b), but instead was offered to portray defendant as a violent man who harbored ill will toward police. Defendant also argues that this line of questioning exceeded the scope of N.C.G.S. § 8C-1, Rule 608(b), because the inquiry regarding the specific instances of conduct was not probative of truthfulness.

Rule 10(b)(1) of the North Carolina Rules of Appellate Procedure states, in part, that "[i]n order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion." N.C. R. App. P. 10(b)(1). Because defendant concedes that he did not object to this cross-examination, our review of this issue is limited to plain error. *See id.* 10(c)(4); *see also State v. Cummings*, 346 N.C. 291, 313-14, 488 S.E.2d 550, 563 (1997), *cert. denied*, 522 U.S. 1092, 139 L. Ed. 2d 873 (1998). Plain error is applied cautiously and only in exceptional cases when

> after reviewing the entire record, it can be said the claimed error is a *"fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings."

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.) (footnotes omitted), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)) (alteration in original). Under this standard, a "defendant is entitled to a new trial only if the error was so fundamental that, absent the error, the jury probably would have reached a different result." *State v. Jones*, 355 N.C. 117, 125, 558 S.E.2d 97, 103 (2002).

Our review of the record and transcripts satisfies us that this case does not meet the test for finding plain error. The State presented strong evidence of defendant's guilt through the testimony of three eyewitnesses who were present at the corner of Moore and Hillsboro Streets when Officer Turner was shot. All three gave consistent testimony identifying defendant as the shooter. One of those witnesses, Autry, also testified that earlier in the evening defendant expressed anger about his brother's incarceration and that he "wanted to shoot a police [officer]." Moreover, defendant himself indicated several

times on direct examination that he does not like to be troubled by police. When asked by defense counsel about spending time at the telephone booth on the corner of Moore and Hillsboro Streets, defendant stated that he would "go up there and see what's going on" and "dress[] a certain way . . . [to] fit in with the—with the drunks and homeless people, so you won't get harassed by the police." Defendant later stated that when Officer Turner approached the telephone booth on the night of the murder, he wanted to get away because he "knew that [Officer Turner] was gonna harass somebody, ask questions, and try to search people." Furthermore, defendant admitted to the jury that he is a crack cocaine dealer who sometimes worked the Moore Street area and that on the day Officer Turner was murdered, he went to Moore Street to "make some money" and "socialize." He possessed approximately twenty "rocks" and made one sale. *See State v. Lyons*, 340 N.C. 646, 668-69, 459 S.E.2d 770, 782-83 (1995) (noting that evidence of drug-dealing activities was admissible under Rule 404(b) to show motive to kill a law enforcement officer).

In light of the eyewitnesses' testimony and defendant's own concessions on the stand, we cannot say that the cross-examination amounted to a miscarriage of justice or denied defendant a fundamental right. Because we find no plain error, this assignment of error is overruled.

**[3]** Defendant next makes the related argument that his trial counsel provided ineffective assistance by failing to object to the questioning about the twenty-two alleged prior instances of wrongdoing and to request a limiting instruction, in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19 and 23 of the North Carolina Constitution. Defendant has supplemented his brief by filing a motion for appropriate relief (MAR) with this Court, arguing that trial counsel did not have any strategic or tactical reason for not objecting to this cross-examination or requesting a limiting instruction.

"When a defendant attacks his conviction on the basis that counsel was ineffective, he must show that his counsel's conduct fell below an objective standard of reasonableness." *State v. Braswell*, 312 N.C. 553, 561-62, 324 S.E.2d 241, 248 (1985). To meet this burden, the defendant must satisfy the two-pronged test promulgated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674 (1984), and expressly adopted by this Court in *Braswell*. First, the defendant must demonstrate a deficiency in coun-

sel's performance by showing " 'errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " *Braswell*, 312 N.C. at 562, 324 S.E.2d at 248 (quoting *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693). Second, the defendant must also show prejudice by establishing that "the error committed was so serious that a reasonable probability exists that the trial result would have been different" absent the error. *State v. Gainey*, 355 N.C. 73, 112, 558 S.E.2d 463, 488, *cert. denied*, 537 U.S. 896, 154 L. Ed. 2d 165 (2002). Thus, the error must be "so grave that it deprived [the defendant] of a fair trial because the result itself is considered unreliable." *State v. Lee*, 348 N.C. 474, 491, 501 S.E.2d 334, 345 (1998).

In reviewing defendant's claim in his brief that his trial counsel's representation was objectively unreasonable and his claim in his MAR that trial counsel had no strategic reason for not objecting to the State's cross-examination as to the prior acts of misconduct, we must strive to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694. Thus, were we to address the issue of whether trial counsel's performance was deficient, we would be in the difficult position of balancing counsel's failure to object to allegedly improper cross-examination against counsel's successful efforts thereafter to block the prosecutor's attempts to introduce extrinsic evidence of those prior acts of misconduct. However, when this Court is able to determine that defendant has not been prejudiced by any alleged ineffectiveness of counsel, we need not consider whether counsel's performance was deficient. *Id.* at 697, 80 L. Ed. 2d at 699; *Braswell*, 312 N.C. at 563, 324 S.E.2d at 248-49. In light of the compelling evidence of defendant's guilt discussed above, including the testimony of three eyewitnesses identifying defendant as Officer Turner's assailant, we perceive no reasonable probability that defense counsel's failure to object to the alleged errors and to request a limiting instruction deprived defendant of a fair trial whose result is reliable. This assignment of error is overruled and defendant's MAR is denied.

[4] Defendant also contends that the trial court erred when it admitted certain testimony from Autry over defendant's objection. On direct examination, Autry testified about events that occurred after the shooting of Officer Turner, including the reason why Autry's aunt took his girlfriend Kajeana and his children to a motel. Defendant assigns error to the following exchange:

Q. Now, why did Kajeana want to take the children and go to a motel to spend the night that night?

[DEFENSE COUNSEL]: Objection. That's speculation on why Kajeana wanted to go to the motel for a night.

THE COURT: Overruled. If he knows.

. . . .

Q. Do you know why she needed to go?

A. She was scared that the defendant, you know what I'm sayin', [would] try to come back and get me or—

. . . .

[DEFENSE COUNSEL]: Motion to strike, your Honor.

A. —the kids.

THE COURT: Denied.

Defendant argues that this testimony was irrelevant and improper character evidence that portrayed defendant as a violent and dangerous man. However, " '[i]t is well established that the admission of evidence without objection waives prior or subsequent objection to the admission of evidence of a similar character.' " *State v. Nobles*, 350 N.C. 483, 501, 515 S.E.2d 885, 896 (1999) (quoting *State v. Campbell*, 296 N.C. 394, 399, 250 S.E.2d 228, 231 (1979)). Earlier in his direct testimony, when Autry was asked what happened after defendant shot Officer Turner, the following exchange took place:

Q. All right. Now, did you then remain there at the apartment with your girlfriend or did you leave?

A. Um, I left, you know what I'm sayin', shortly after that.

Q. And where did you go?

A. I went to, um, the Economy Inn.

Q. Okay. And why did you go to the Economy Inn?

A. Um, I went there to, um, use this guy's car. I was coming back to get my girlfriend, the kids, because they were scared that [defendant] might do something or, you know—and they didn't want to stay in the house, so I was going to take 'em to a hotel.

This prior testimony from Autry describing the fear of defendant felt by his girlfriend and children was admitted without objection. Accordingly, defendant's subsequent objection was waived. *See Nobles*, 350 N.C. at 501, 515 S.E.2d at 896; *see also State v. Valentine*, 357 N.C. 512, 525, 591 S.E.2d 846, 857 (2003).

In addition, we note that at trial defendant objected to this evidence on the ground that it was speculative, while on appeal he argues that Autry's testimony violated N.C.G.S. § 8C-1, Rules 404(a) and 405, pertaining to character evidence. "This Court has long held that where a theory argued on appeal was not raised before the trial court, 'the law does not permit parties to swap horses between courts in order to get a better mount in the Supreme Court.'" *State v. Sharpe*, 344 N.C. 190, 194, 473 S.E.2d 3, 5 (1996) (quoting *Weil v. Herring*, 207 N.C. 6, 10, 175 S.E. 836, 838 (1934)); *see also State v. Hamilton*, 351 N.C. 14, 22, 519 S.E.2d 514, 519 (1999) (the defendant precluded on appeal from arguing admissibility of evidence for impeachment purposes when at trial he sought admission of the evidence under Rule 404(b)), *cert. denied*, 529 U.S. 1102, 146 L. Ed. 2d 783 (2000). Therefore, defendant's claim is also waived for this reason.

Moreover, even assuming that defendant did not waive his objection to Autry's testimony, the evidence was properly admitted. Generally, "[a]ll relevant evidence is admissible." N.C.G.S. § 8C-1, Rule 402 (2003). "Relevant evidence" is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.*, Rule 401 (2003). In a criminal case, "every circumstance calculated to throw any light upon the supposed crime is admissible and permissible." *State v. Collins*, 335 N.C. 729, 735, 440 S.E.2d 559, 562 (1994). Defendant has consistently maintained that he did not kill Officer Turner and that the killer was one of three others at the telephone booth that night. Specifically, defendant sought to pin responsibility on Autry. Defense counsel observed in opening statement that Autry "had the most to gain from the death of . . . Officer Roy Turner." Defense counsel's cross-examination of Autry concerning his actions after the shooting further exemplifies defendant's strategy of suggesting that Autry was guilty. Accordingly, Autry's direct testimony was relevant to show that he did not flee to a motel after Officer Turner was shot because he was guilty, as argued by defendant, but rather to assist his frightened girlfriend and children. Thus, Autry's testimony was admissible to shed light on cir-

cumstances surrounding the crime and its aftermath. This assignment of error is overruled.

**[5]** Defendant next argues that the trial court erred by failing to intervene *ex mero motu* during different portions of the prosecution's closing arguments in the guilt-innocence phase of the trial. The first argument in question addressed defendant's alleged history of disrespect toward law enforcement and corrections officers. One of the prosecutors made the following argument:

> If there's an overall theme with respect to this case, I think it is that this defendant does not like to be harassed by cops. Now, what does that mean? He said he didn't want people trying to make him do things that he didn't want to do. Really what it boils down to, folks, is he doesn't want, doesn't like police officers doing their job. It's just that simple. Harassment. He doesn't like to be harassed.
>
> . . . .
>
> Now, what this defendant is telling you is that he does not want a cop doing his job and involving him. And there was example after example after example replete with his arrogance, his defiance, his combativeness, his total disregard for authority. That's what this case comes down to. . . .
>
> . . . .
>
> . . . You learned things about his attitude, about his demeanor, about his views on people of authority doing their job. "They're always harassing me." A common theme throughout everything he told you about with respect to his contact with law enforcement officers, from the Laundromat at College Lakes—(pause)— to the breaking and entering and larceny that gave rise to the first prison sentence.

Pursuing this theme, another prosecutor argued:

> We have the same situation in this situation where Officer Turner is killed that you've seen in the testimony of every single incident of this defendant having trouble with law enforcement officers. He has a total disregard for society. And it came to a head whenever he laughed at snuffing out the life of this officer.

Defendant maintains that these arguments improperly appealed to the jury's emotions, encouraging the jurors to convict defendant

because of his alleged lack of respect for and hostility toward law enforcement and corrections officers. In addition, defendant contends that this line of argument, focusing on defendant's contrary character to reinforce the State's theory that defendant shot Officer Turner, was not based on inferences fairly drawn from the trial evidence. Defendant did not object to these arguments. Accordingly, we must determine whether " 'the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu.*' " *State v. Jones*, 358 N.C. 330, 349-50, 595 S.E.2d 124, 137 (quoting *Jones*, 355 N.C. at 133, 558 S.E.2d at 107), *cert. denied*, —— U.S. ——, 160 L. Ed. 2d 500 (2004). Under this standard,

> the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.

*Jones*, 355 N.C. at 133, 558 S.E.2d at 107.

In a capital case, prosecutors are granted wide latitude in their closing arguments and have a duty to argue all the facts in evidence and all reasonable inferences that can be drawn therefrom. *State v. Smith*, 359 N.C. 199, 210, 607 S.E.2d 607, 616-17 (2005). Nevertheless, such "latitude" is not limitless, *see Jones*, 355 N.C. at 129, 558 S.E.2d at 105, and counsel may not place " 'before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs and personal opinions not supported by the evidence,' " *Jones*, 358 N.C. at 350, 595 S.E.2d at 137 (quoting *State v. Locklear*, 294 N.C. 210, 217, 241 S.E.2d 65, 69 (1978)); *see also* N.C.G.S. § 15A-1230(a) (2003).

Here, the State's argument was based on the evidence and appropriate inferences from that evidence. The State's theory that defendant shot Officer Turner was supported by substantial evidence that defendant harbored ill will toward law enforcement personnel. For example, not only did Autry testify that defendant was upset with police because of his brother's incarceration, defendant himself twice referred to police "harassment" during his direct examination. First, defendant testified that he sometimes dressed a certain way when hanging around the telephone booth with the drunks and the homeless "so you won't get harassed by the police." Later, defendant stated that when Officer Turner approached the telephone booth, he "knew

that [Officer Turner] was gonna harass somebody" and that he wanted "to get away from him so [he] wouldn't get harassèd." On cross-examination, when asked if he did not like being harassed by law enforcement officers, defendant responded that he did not "like to be harassed by anyone." Defendant also grumbled to investigating officers about being harassed. In addition, defendant discussed his prior convictions on direct examination and admitted on cross-examination to hitting a uniformed law enforcement officer outside the College Lakes Laundromat. In light of this record, it is apparent that the prosecutors' arguments were based on facts in evidence and were relevant to the issue of defendant's motive for shooting Officer Turner. *State v. Mason*, 337 N.C. 165, 175, 446 S.E.2d 58, 63 (1994) ("[E]vidence of motive . . . ' "is not only competent, but often very important, in strengthening the evidence for the prosecution." ' ") (citations omitted). The cited arguments of counsel were not grossly improper and the trial court did not err by failing to intervene *ex mero motu.*

[6] Defendant also argues that another portion of the State's closing argument during the guilt-innocence phase was improper. The pertinent portions of the prosecutor's arguments related to Jerome Farmer, a witness for defendant who testified that he saw the group standing around the telephone booth shortly before the shooting and that Carlysle was "acting fidgety" and appeared to have a pistol in his pocket. Farmer further testified that later that night, another individual whom he knew as Andre or Adrian Crump (Crump's true name is Adrian Sturdivant) came to the house where Farmer was living and told Farmer that Carlysle was "crazy" and "stupid" and had shot the officer. During closing argument, the State addressed this testimony by contending:

> Talk about inconsistencies and contradictions, let's talk about Jerome Farmer, one of the most incredible witnesses you'll ever see in any courtroom in this country. That hulk of a man sitting there in the horizontal black and white stripes, head down, mumbling, couldn't even be heard, wouldn't even answer the defense attorneys' questions, the side that called him. Had to be asked at least five times to tell his incredible story before we finally got it out. Just like pulling teeth.

>       . . . .

> And then [witness Farmer] says, in that same exhibit, speaking to [Assistant District Attorney] Ms. Kelley, "Tell my lawyer to

come and see me." And here's the kicker, "And you tell him what you want me to know about the case." He's trying to sell his testimony, folks. He's trying to sell the state a bill of goods. And Elaine Kelley would have nothing to do with it. She didn't go see him. She didn't correspond with him. And he didn't get this deal with his conditions. And what happens? He's going federal. And he's gonna do a long, long time. And why is he going federal, and why is he gonna do a long, long time? Because the state didn't buy his junk. Because the state didn't meet his conditions. Because the state didn't go over and tell him what [sh]e wanted him to know about the case so that he could come in here and regurgitate it all over you.

Not only did his demeanor tell you that he was totally incredible, these letters tell you that he's totally incredible. Apparently he forgot to tell his lawyer and the defense what he was saying to Ms. Kelley.

There are other letters. You've had the opportunity to hear them and read them. He teased her, telling her that he knew something about, quote-unquote, "the cop murder," but she didn't fall for it. The state didn't go for it. And you shouldn't go for one word that he said from that stand.

Defendant maintains that the prosecutor's arguments impermissibly stated his personal opinion about Farmer's credibility, distorted the record, and were abusive. Defendant did not raise a contemporaneous objection, so we must determine whether the trial court should have intervened *ex mero motu*. *Jones*, 358 N.C. at 349-50, 595 S.E.2d at 137.

Although defendant correctly observes that attorneys may not express their personal opinions during closing arguments, *see id.* at 350, 595 S.E.2d at 137, we have held that prosecutors are allowed to argue that the State's witnesses are credible. *See, e.g., State v. Wiley*, 355 N.C. 592, 621-22, 565 S.E.2d 22, 43-44 (2002) (noting the difference between improperly vouching for a State witness and giving the jury reasons to believe the State's evidence), *cert. denied*, 537 U.S. 1117, 154 L. Ed. 2d 795 (2003). Similarly, a lawyer " ' "can argue to the jury that they should not believe a witness." ' " *State v. Golphin*, 352 N.C. 364, 455, 533 S.E.2d 168, 227 (2000) (citations omitted), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). Additionally, a prosecutor's statements during closing argument should not be viewed in isolation but must be considered in " 'the context in which the

remarks were made and the overall factual circumstances to which they referred.' " *State v. Jaynes*, 353 N.C. 534, 559, 549 S.E.2d 179, 198 (2001) (quoting *State v. Green*, 336 N.C. 142, 188, 443 S.E.2d 14, 41, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994)), *cert. denied*, 535 U.S. 934, 152 L. Ed. 2d 220 (2002).

Applying these principles to the case at bar, we conclude that the statements contested by defendant did not stray outside the bounds of proper argument. The defense called Farmer to impeach the testimony of Adrian Sturdivant/Andre Crump. During the State's case-in-chief, Sturdivant testified that after the murder, he ran to the house of Lillie Ann Hawkins and William Jones and said that "Q [defendant] shot the rollers." Testifying as a rebuttal witness for defendant, Farmer indicated that Sturdivant had said instead that Carlysle, not defendant, had done something "stupid" and "crazy."

Q. Did Adrian Crump [Adrian Sturdivant] say anything else when he came into the house?

A. Yeah.

Q. What did he say?

(Pause.)

THE COURT: Mr. Farmer.

A. The way he was saying, like Little D [Carlysle] did it.

Q. Please keep your voice up and repeat that.

A. The way he was saying to me, like Little D did it.

Q. Did what?

A. Shoot the police officer.

Q. Mr. Farmer, is that, in fact, what you heard that night Adrian Crump say?

A. Yes, sir.

Farmer also testified that Carlysle later said "The gun is sleeping with the fishes."

Because Farmer implicated someone other than defendant as the shooter, his credibility was fair game. The prosecutor's closing arguments highlighted facts in evidence and reasonable inferences drawn

from those facts. The prosecutor's comment about Farmer's dress was preceded by defense counsel's eliciting on direct examination that Farmer was wearing a "black and white striped outfit" because he was incarcerated in the Brunswick County jail. Defense counsel repeatedly asked Farmer to speak up, and the trial court on numerous occasions had to instruct Farmer to answer the questions asked. Farmer acknowledged on cross-examination that state charges against him had been dropped and that he was going to be indicted under federal charges. He also admitted writing nine letters to Assistant District Attorney Kelley. These letters, which were read aloud and introduced into evidence, create a reasonable inference that Farmer had been hoping to receive favorable treatment from the State in exchange for his testimony in the present case.

Thus, it is apparent that the prosecutor's argument appropriately focused on reasons the jury should not believe Farmer. *See Golphin*, 352 N.C. at 455, 533 S.E.2d at 227. After advising the jury that he was going to talk about the "inconsistencies and contradictions" in Farmer's testimony, the prosecutor recounted the witness' testimony and demeanor but stopped short of calling the witness a liar or otherwise injecting his personal opinion. *Id.* (stating that it is acceptable for the prosecutor to argue why a witness should not be believed but impermissible to assert his opinion that a witness is lying); *see also State v. Flippen*, 349 N.C. 264, 276, 506 S.E.2d 702, 710 (1998) (holding that the prosecutor's characterization of a defendant's courtroom conduct was permissible because the defendant's demeanor is " 'before the jury at all times' " (quoting *State v. Myers*, 299 N.C. 671, 680, 263 S.E.2d 768, 774 (1980))), *cert. denied*, 526 U.S. 1135, 143 L. Ed. 2d 1015 (1999). Finally, while the single reference to Farmer as a "hulk of a man" was gratuitous and unnecessary, it was not so improper as to require action by the trial court in the absence of an objection. *See State v. Braxton*, 352 N.C. 158, 204, 531 S.E.2d 428, 455 (2000) (holding that prosecutor's one-time description of the defendant as "that thing" not so disparaging as to demand the trial court's intervention *ex mero motu*), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001). Accordingly, the trial court was not required to intervene *ex mero motu*.

Even if we were to assume that the arguments about defendant's motive and about Farmer's credibility were improper, defendant has failed to demonstrate prejudice by showing how these comments, either alone or together, "infected the trial with unfairness and thus rendered the conviction fundamentally unfair." *State v. Carroll*, 356

N.C. 526, 537, 573 S.E.2d 899, 907 (2002), *cert. denied,* 539 U.S. 949, 156 L. Ed. 2d 640 (2003).

These assignments of error are overruled.

**[7]** Defendant again makes the related contention that his trial counsel's failure to object to these closing arguments deprived him of effective assistance of counsel. We determined above that the arguments were not so grossly improper as to require intervention by the trial court *ex mero motu.* This analysis also satisfies us that defendant has failed to demonstrate that his counsel's conduct fell below an objective standard of reasonableness, *Braswell,* 312 N.C. at 562, 324 S.E.2d at 248, or that a reasonable probability exists that the trial result would have been different if counsel had objected, *Gainey,* 355 N.C. at 112-13, 558 S.E.2d at 488. This assignment of error is overruled.

**[8]** Defendant next contends that the trial court erred in denying his oral request for a special jury instruction concerning the testimony and credibility of prosecution witness Autry. During the charge conference, defendant requested the trial court to instruct the jury that at the time of the trial, Autry could be facing habitual felon status if he were convicted of a pending felony cocaine charge. Although Autry had not been indicted as an habitual felon, defendant argued to the trial court that the jury should be instructed on his potential status so it could determine "whether that has an impact on his testimony in that case, whether it makes him interested or not."

During this charge conference, defendant's counsel stated that it would present to the court and the prosecution a proposed instruction when the court reconvened. The trial judge denied the oral request for the special instruction but agreed to allow defense counsel "to tender an instruction for the record" the next court day. However, when court opened the following Monday, defendant did not submit a pertinent proposed written instruction. Accordingly, the trial judge gave the jury the pattern instructions relating to interested witnesses:

You may find that a witness is interested in the outcome of this trial. In deciding whether or not to believe such a witness, you may take his interest into account. If, after doing so, you believe his testimony in whole or in part, you should treat what you believe the same as any other believable evidence.

1 N.C.P.I.—Crim. 104.20 (1970). Defendant complains that this general instruction failed to address Autry's potential special interest in testifying against him in order to avoid being prosecuted as an habitual felon.

"At the close of the evidence . . . , any party may tender written instructions[,]" N.C.G.S. § 15A-1231(a) (2003), and "where 'a specifically requested jury instruction is proper and supported by the evidence, the trial court must give the instruction, at least in substance,' " *State v. Jones*, 337 N.C. 198, 206, 446 S.E.2d 32, 36 (1994) (quoting *State v. Ford*, 314 N.C. 498, 506, 334 S.E.2d 765, 770 (1985)). However, such requested special instructions "should be submitted in writing to the trial judge at or before the jury instruction conference." Gen. R. Pract. Super. and Dist. Ct. 21, para. 1, 2005 Ann. R. N.C. 18. Accordingly, this Court has held that a trial court did not err where it declined to give requested instructions that had not been submitted in writing. *See State v. McNeill*, 346 N.C. 233, 240, 485 S.E.2d 284, 288 (1997), *cert. denied*, 522 U.S. 1053, 139 L. Ed. 2d 647 (1998); *State v. Martin*, 322 N.C. 229, 237, 367 S.E.2d 618, 623 (1988).

Here, defendant's request during the charge conference was made orally. In denying the request, the trial court gave defendant the opportunity to tender a written instruction for the record when court next convened. Despite this accommodation, defendant made no such tender. Accordingly, we find no error in the trial court's denial of defendant's oral request.

Moreover, even had defendant provided a written proposed instruction, we are satisfied that the instruction given by the trial court covered the essence of defendant's request. As long as the trial court provides the substance of a requested proper instruction, it need not use the specific language proposed by a party. *Nicholson*, 355 N.C. at 67, 558 S.E.2d at 152. At the charge conference here, counsel for defendant asked that the court give a portion of the "instruction from [N.C.P.I.—Crim.] 203.10 regarding [Autry's] prior convictions" on the grounds that those convictions could qualify Autry for habitual felon status if he were convicted of the charge pending against him. However, because instruction 203.10 is the substantive instruction to be used at an habitual felon *trial*, defense counsel correctly conceded that this instruction was not directly applicable and that Autry did not have an interest in the outcome of defendant's trial. The transcript indicates that defense counsel's real interest was that the jury should know of Autry's status and have the opportunity to determine whether his desire to avoid prosecution as a habitual felon

motivated him to testify for the State. This concern was captured in the pattern jury instruction relating to interested witness testimony that the court provided during the guilt-innocence phase of the trial. *See State v. Watson*, 294 N.C. 159, 167-68, 169-70, 240 S.E.2d 440, 446-47 (1978) (interested witness instruction adequate where trial court did not provide the name of the purportedly interested witness). Because the instructions substantively reflected "the concept defendant wished to convey to the jury," *McNeill*, 346 N.C. at 239, 485 S.E.2d at 288, defendant has failed to demonstrate that the instruction was deficient, *State v. Rhinehart*, 324 N.C. 310, 315-16, 377 S.E.2d 746, 749 (1989). This assignment of error is overruled.

## SENTENCING PROCEEDING

[9] As to sentencing, defendant argues that the trial court erred by admitting evidence of an incident that occurred in the Cumberland County Jail while he was awaiting trial. Cumberland County Sheriff's Deputy Melody Clark testified that while she was working as a jailer on 19 March 2002, she received an intercom call from defendant claiming that there was a problem in his cell block. Deputy Clark alerted Corporal Jennifer Harris, her supervisor, and Corporal Harris and two other deputies went to defendant's cell block to investigate. Corporal Harris testified that, upon her arrival, the inmates seemed "rowdy" and "excited," so she decided to remove defendant for his own protection and for the protection of others. According to Corporal Harris, defendant was upset and asked where he was being taken. When Corporal Harris informed defendant that he was going to be locked in a single cell, defendant responded that when he was unlocked, "he was going to . . . get anybody that he could. Whether it be an officer or an inmate, it didn't matter. He didn't care." Defendant also told Corporal Harris: "I'm going to get whoever I can when I'm unlocked. You can read my file. It doesn't matter. I don't care what happens to me." Defendant made this threat approximately three times while he was being taken to the single cell.

Before Deputy Clark and Corporal Harris testified, defense counsel orally objected to the evidence outside the presence of the jury. The State contended that the evidence was relevant for two reasons: (1) as a tacit admission of defendant's involvement in the murder of Officer Turner, and (2) to support the finding of the N.C.G.S. § 15A-2000(e)(8) aggravating circumstance that the capital felony was committed against a law enforcement officer engaged in the performance of official duties. The trial court overruled defend-

ant's objection. After these witnesses testified, defendant's motion to strike their testimony was denied.

Defendant claims that this evidence was irrelevant and prejudicial and that he is therefore entitled to a new sentencing proceeding.[1] At the time this case was tried, we had interpreted Rule 10(b)(1) of the North Carolina Rules of Appellate Procedure to require that an attorney make a contemporaneous objection to a trial court's decision to admit evidence, even if the attorney had previously obtained a ruling on the basis of a motion *in limine. State v. Thibodeaux*, 352 N.C. 570, 581-82, 532 S.E.2d 797, 806 (2000), *cert. denied*, 531 U.S. 1155, 148 L. Ed. 2d 976 (2001). Defendant failed to object to the trial court's ruling in the presence of the jury as required by *Thibodeaux* and thus did not preserve this issue. However, on 21 May 2003, the General Assembly amended N.C. Rule of Evidence 103(a) to provide that once the trial court makes "a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Act of May 21, 2003, ch. 101, 2003 N.C. Sess. Laws 127, 127 (conforming N.C. R. Evid. 103 to corresponding federal rule). Although application of this amendment was prospective from its effective date of 1 October 2003, in light of the gravity of defendant's capital sentence, we will review the admissibility of this evidence pursuant to Rule 2 of the North Carolina Rules of Appellate Procedure to assure that defendant does not suffer a manifest injustice. N.C. R. App. P. 2.

The rules of evidence do not apply in sentencing proceedings, N.C.G.S. § 8C-1, Rule 1101(b)(3) (2003), and any competent evidence which the court deems to have probative value may be received, *id.* § 15A-2000(a)(3) (2003). Accordingly, the parties may present a wide array of evidence at a sentencing proceeding. *See State v. White*, 355 N.C. 696, 704-05, 565 S.E.2d 55, 61 (2002), *cert. denied*, 537 U.S. 1163, 154 L. Ed. 2d 900 (2003). Even assuming the evidence of defendant's remarks on 19 March 2002 was improperly admitted under these less restrictive standards, defendant is not entitled to a new sentencing proceeding unless he can establish prejudice, that is, a reasonable possibility that a different result would have been reached had the evidence been excluded. N.C.G.S. § 15A-1443(a) (2003). Here, the evi-

---

1. Defendant's brief also contains a statement that the erroneous admission of this evidence violated his rights under the United States Constitution. Because defendant presents no support for this contention, we deem his constitutional claim to be abandoned. N.C. R. App. P. 28(a), (b)(6).

STATE v. AUGUSTINE

[359 N.C. 709 (2005)]

dence was offered by the State on the grounds that defendant's statements were a tacit admission that he killed Officer Turner and also to support the submission of the N.C.G.S. § 15A-2000(e)(8) aggravator. Acknowledging in his brief that the jury had already found in the guilt-innocence phase that defendant had murdered Officer Turner, defendant argues that this evidence was cumulative, used to "pad" the State's case and assuage any lingering concerns the jurors may have harbored about defendant's culpability. Defendant also argues that the evidence was not relevant to establish that Officer Turner was carrying out his official duties when shot. However, in light of the other evidence presented in this case, we do not perceive any likelihood that the jury would have reached a different conclusion if it had not heard this evidence. Because we have considered defendant's substantive argument, we need not consider his contention that defense counsel's failure to make a contemporaneous objection constituted ineffective assistance of counsel.

These assignments of error are overruled.

[10] Defendant next argues that one of his defense attorneys made a statement during the sentencing proceeding closing arguments that was contrary to defendant's interests and deprived him of effective assistance of counsel. Defense counsel argued that:

> [The prosecutor] came before you and she held up two photographs. And basically what she was saying to you was "before Quintel Augustine" and "after Quintel Augustine." Folks, I'll hold up a picture. It's a picture of Quintel praying. A life has value.
>
> In my other hand, I hold up a blank piece of paper, because this picture is going to be decided by you. Is this picture going to show Quintel Augustine spending the rest of his natural life in the Department of Corrections of North Carolina? Or is it gonna show him strapped to a gurney after he's received a lethal injection?
>
> *Now, he will feel no pain.* The pain will be felt by his family—the very, very pain that Mr. Turner told you that no family should ever have to endure.

(Emphasis added.) Defendant contends his counsel's remark that he would "feel no pain" from execution by lethal injection has no factual basis and sought to minimize the jury's legal, moral and emotional responsibility as it considered the death penalty.

In reviewing an ineffective assistance claim, we resist the urge to second-guess trial counsel's actions. *See Gainey*, 355 N.C. at 113, 558 S.E.2d at 488. Because "[c]ounsel is given wide latitude in matters of strategy," *State v. Fletcher*, 354 N.C. 455, 482, 555 S.E.2d 534, 551 (2001), *cert. denied*, 537 U.S. 846, 154 L. Ed. 2d 73 (2002), "defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy,' " *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 100 L. Ed. 83, 93 (1955)). Our review of the record reveals that this argument was consistent with such a trial strategy.

The prosecution offered emotional victim-impact evidence through the testimony of Officer Turner's parents at the sentencing proceeding. Recounting his experience in the hospital the night his son was shot, Mr. Turner said: "I've never seen him down. . . . It was hard for me to go in there and see that. And when I . . . did get enough nerve to go in, . . . I hope no parent have to go in and see they—they child in that type of situation." Mr. Turner later told the jury that his "whole world [has] changed" and he "lost a part of [himself]" since his son's death. Similarly, Mrs. Turner told the jury that "there's no way . . . a person can understand what I'm going through" and that "[i]t's heartbreaking. It's—it's a tremendous loss. I feel helpless. I feel—not angry, but I just feel like something has been torn away from me. There's an emptiness here that will never be replaced by anything." In advocating for the death penalty, the prosecutor incorporated this evidence into her closing argument when she stated that "[t]he bullet—the bullets may have killed Roy Turner instantly, meaning taken away his brain functions, but the pain here . . . will last forever. The pain of the mom. You heard from her. It's very real. . . . The pain will last forever for dad . . . ."

In arguing that his counsel's response to this victim-impact evidence was improper, we believe defendant both takes his counsel's comment out of context and construes it too literally. *See State v. Hinson*, 341 N.C. 66, 78, 459 S.E.2d 261, 268 (1995). The record demonstrates that defense counsel was building on the testimony of Officer Turner's family for the purpose of evoking similar sympathy for defendant's family. The focus of counsel's argument was not that defendant would not feel pain if he were executed, but that defendant's parents, like Officer Turner's, would continue to experience the pain of losing a child long after defendant's death. Defense co-counsel's closing argument continued this theme that there had

been enough suffering when he also referred to the testimony of Officer Turner's parents, then asked the jury to not "let two families leave this courtroom with holes that large and deep that never heal." Accordingly, defendant has failed to establish that the challenged remark exceeded the wide latitude granted trial counsel in matters of strategy and closing argument. *See Fletcher*, 354 N.C. at 482, 555 S.E.2d at 551 (strategy); *Jones*, 355 N.C. at 128, 558 S.E.2d at 105 (closing argument). This assignment of error is overruled.

**[11]** Defendant next contends that the prosecutor's following argument improperly distorted the record and expressed the prosecutor's personal opinion: "Use your common sense, folks, is what I will next ask you to do. The defendant—have you seen displays of remorse? There has been a total lack of remorse on his part."

Because defense counsel timely objected to the closing argument, we must determine "whether the trial court abused its discretion by failing to sustain the objection." *Jones*, 355 N.C. at 131, 558 S.E.2d at 106. Under this test, we reverse a trial court "only upon a showing that its ruling could not have been the result of a reasoned decision." *State v. Burrus*, 344 N.C. 79, 90, 472 S.E.2d 867, 875 (1996). When applying this standard to closing arguments,

> this Court first determines if the remarks were improper. . . . [I]mproper remarks include statements of personal opinion, personal conclusions, name-calling, and references to events and circumstances outside the evidence . . . . Next, we determine if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court.

*Jones*, 355 N.C. at 131, 558 S.E.2d at 106.

Here, defendant argues the prosecutor's statement that "[t]here has been a total lack of remorse" was improper because it ignored evidence in the record that defendant had expressed sympathy for Officer Turner's family. However, an examination of the transcript reveals no impropriety. The challenged remarks were part of an argument that urged the jury to use its "common sense" in evaluating defendant's courtroom demeanor throughout the trial. This Court has held that comments by the State concerning a defendant's courtroom conduct are permissible because the defendant's demeanor is " ' "before the jury at all times." ' " *Nicholson*, 355 N.C. at 42-43, 558 S.E.2d at 137-38 (citations omitted). More specifically, we have considered and found proper arguments addressing a defendant's appar-

ent lack of remorse during trial. *See, e.g., State v. McNatt,* 342 N.C. 173, 175-76, 463 S.E.2d 76, 77-78 (1995) (prosecutor's argument about the defendant's courtroom demeanor proper); *State v. Brown,* 320 N.C. 179, 199, 358 S.E.2d 1, 15 ("Urging the jurors to observe defendant's demeanor for themselves does not inject the prosecutor's own opinions into his argument, but calls to the jurors' attention the fact that evidence is not only what they hear on the stand but what they witness in the courtroom."), *cert. denied,* 484 U.S. 970, 98 L. Ed. 2d 406 (1987). In light of these holdings, the trial court did not abuse its discretion in overruling defendant's objection. This assignment of error is overruled.

[12] In his final assignment of error arising out of the sentencing proceeding, defendant argues that a different portion of the prosecutor's closing argument was grossly improper. The prosecutor argued:

> I know you're not supposed to do it, but I can't help myself. This act was committed by a despicable human being. I know you and I both saw his family come up here last week and talk about him as a child. I cannot argue with them about their recollections of him as a child. I only know the adult.

Defendant maintains that the prosecutor impermissibly and abusively expressed personal opinion through these remarks and that they were designed to appeal to the passions of the jury. Acknowledging that counsel did not object to this argument, defendant contends that the trial court erred by failing to intervene *ex mero motu.*

Defendant can demonstrate that this closing argument amounted to gross impropriety warranting such trial court intervention by showing " 'that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair.' " *State v. Anthony,* 354 N.C. 372, 427-28, 555 S.E.2d 557, 592 (2001) (quoting *State v. Davis,* 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998), *cert. denied,* 526 U.S. 1161, 144 L. Ed. 2d 219 (1999)), *cert. denied,* 536 U.S. 930, 153 L. Ed. 2d 791 (2002). We have acknowledged the tension between the wide latitude granted counsel generally during closing arguments, *Smith,* 359 N.C. at 210, 607 S.E.2d at 616-17, the prosecutor's duty zealously to advocate the appropriateness of the death penalty to the jury under the facts presented, *State v. Strickland,* 346 N.C. 443, 467, 488 S.E.2d 194, 208 (1997), *cert. denied,* 522 U.S. 1078, 139 L. Ed. 2d 757 (1998), and the need to regulate the acceptable bounds of closing argument and preserve professionalism, *Jones,* 355 N.C. at 135, 558 S.E.2d at 108.

We have found no prejudice under similar circumstances. In *State v. Frazier*, 121 N.C. App. 1, 464 S.E.2d 490 (1995), *aff'd*, 344 N.C. 611, 476 S.E.2d 297 (1996), the defendant was charged with indecent liberties and rape. The prosecutor argued to the jury that the defendant and another were "[j]ust as evil and just as sorry and just as mean as two despicable people could ever be on this earth." *Id.* at 16, 464 S.E.2d at 498 (alteration in original). The trial court apparently sustained the defendant's objection, but the defendant did not move to strike. A majority of the Court of Appeals panel determined that the prosecutor's comments, though inappropriate, did not warrant a new trial. *Id.* at 16, 464 S.E.2d at 498-99. On appeal to this Court, the defendant again contended that the prosecutor's argument was improper. Without quoting the prosecutor's specific language, we found no reasonable possibility that the outcome of the trial would have been any different in the absence of the error in the argument. *Frazier*, 344 N.C. at 616-17, 476 S.E.2d at 300-01; *see also State v. Guevara*, 349 N.C. 243, 258, 506 S.E.2d 711, 721 (1998) (the prosecutor's argument in sentencing proceeding of a capital case describing the actions of the defendant as "despicable" did not deny the defendant fundamental fairness), *cert. denied*, 526 U.S. 1133, 143 L. Ed. 2d 1013 (1999).

Here, unlike *Frazier*, defendant did not object to the characterization, so defendant must meet a more demanding standard to establish error. Moreover, the prosecutor's reference to defendant as "a despicable human being" was a passing comment made in a lengthy argument. *Barden*, 356 N.C. at 365, 572 S.E.2d at 139. Although we specifically disapprove of such *ad hominem* attacks on a witness or litigant, *see State v. Rogers*, 355 N.C. 420, 464, 562 S.E.2d 859, 886 (2002), in light of our holding in *Frazier*, we conclude that the trial court did not err by failing to intervene *ex mero motu*. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises several additional issues that he concedes have been decided against him by this Court. Defendant contends that the trial court lacked jurisdiction to try him and enter judgment against him for first-degree murder because the short-form murder indictment alleged the elements of second-degree murder only, making the indictment facially invalid. Defendant also argues that the use of the short-form indictment violated various rights guaranteed to him under the United States and North Carolina Constitutions. However, this Court consistently has held that the short-form indictment is

sufficient to charge a defendant with first-degree murder. *See, e.g.,* *State v. Hunt,* 357 N.C. 257, 274-75, 582 S.E.2d 593, 604-05, *cert. denied,* 539 U.S. 985, 156 L. Ed. 2d 702 (2003); *State v. Wallace,* 351 N.C. 481, 508, 528 S.E.2d 326, 343, *cert. denied,* 531 U.S. 1018, 148 L. Ed. 2d 498 (2000). In a related claim, defendant argues that the trial court erred by denying his motion to dismiss on the grounds that the verdicts and judgments entered varied fatally from the indictments. We have held in similar cases that no variance exists between the charges in the indictments and the judgments entered. *State v. Squires,* 357 N.C. 529, 537, 591 S.E.2d 837, 842-43 (2003), *cert. denied,* 541 U.S. 1088, 159 L. Ed. 2d 252 (2004).

Defendant next maintains that the trial court committed plain error by instructing the jury on Issue Three in a manner that allowed the jury to impose a death sentence after finding that the aggravating and mitigating circumstances were of equal weight. This Court has rejected this argument. *State v. King,* 353 N.C. 457, 491, 546 S.E.2d 575, 599 (2001), *cert. denied,* 534 U.S. 1147, 151 L. Ed. 2d 1002 (2002); *State v. Keel,* 337 N.C. 469, 493-94, 447 S.E.2d 748, 761-62 (1994), *cert. denied,* 513 U.S. 1198, 131 L. Ed. 2d 147 (1995). Defendant argues that the failure to allege aggravating circumstances in the short-form indictment is a jurisdictional defect under North Carolina law that precludes the trial court from imposing the death penalty. Our holdings have been contrary to defendant's position. *Squires,* 357 N.C. at 538-39, 591 S.E.2d at 843; *Hunt,* 357 N.C. at 277-78, 582 S.E.2d at 606-07. Similarly, defendant contends that the trial court violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution because the short-form murder indictment did not allege at least one aggravating circumstance necessary to increase the maximum punishment from life without parole to death. We have upheld the constitutionality of this procedure. *See, e.g., Hunt,* 357 N.C. at 275-77, 582 S.E.2d at 605-06; *Braxton,* 352 N.C. at 174-75, 531 S.E.2d at 437-38.

In addition, defendant assigns as plain error the trial court's instructions to the jury that defendant had the burden to *satisfy* it of the existence of mitigating circumstances. These instructions have been found proper. *State v. Payne,* 337 N.C. 505, 531-33, 448 S.E.2d 93, 108-09 (1994), *cert. denied,* 514 U.S. 1038, 131 L. Ed. 2d 292 (1995). Defendant further argues that the trial court erred by allowing the jury to refuse to give effect to nonstatutory mitigating evidence if the jury deemed the evidence not to have mitigating value. We have rejected this argument. *Id.* at 533, 448 S.E.2d at 109-10; *State v. Lee,*

335 N.C. 244, 292, 439 S.E.2d 547, 572, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994). Defendant contends that the trial court committed error when it instructed the jury that in considering Issues Three and Four, the jurors *may*, rather than *must*, consider mitigating circumstances found in Issue Two of the "Issues and Recommendation as to Punishment" form. We have approved this instruction as meeting the requirements of the statute. *Gregory*, 340 N.C. at 417-19, 459 S.E.2d at 668-69; *State v. Skipper*, 337 N.C. 1, 51-52, 446 S.E.2d 252, 280 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995).

Finally, defendant contends that the death penalty is cruel and unusual punishment in violation of the North Carolina and United State Constitutions; that North Carolina's capital sentencing scheme, N.C.G.S. § 15A-2000 (2003), is vague and overbroad; that N.C.G.S. § 15A-2000 permits juries to make excessively subjective sentencing determinations; and that the statute is applied arbitrarily and pursuant to a pattern of discrimination based on the race and sex of defendants and victims and on defendants' poverty. Defendant also states that the District Attorney for the district of trial does not have written guidelines to determine which murder cases shall be tried capitally. Because defendant presents no argument and cites no authority in support of these contentions, they are deemed abandoned. *See* N.C. R. App. P. 28(b)(6). Assuming *arguendo* that defendant's claims were not abandoned, similar arguments have been rejected by this Court as the North Carolina capital sentencing scheme consistently has been held constitutional. *See State v. Powell*, 340 N.C. 674, 695, 459 S.E.2d 219, 230 (1995), *cert. denied*, 516 U.S. 1060, 133 L. Ed. 2d 688 (1996); *State v. Garner*, 340 N.C. 573, 605, 459 S.E.2d 718, 735 (1995), *cert. denied*, 516 U.S. 1129, 133 L. Ed. 2d 872 (1996).

Defendant raises these issues for the purposes of urging this Court to reconsider its prior decisions and preserving his right to argue these issues on federal review. We have considered defendant's arguments on these additional issues and find no compelling reason to depart from our previous holdings.

These assignments of error are overruled.

## PROPORTIONALITY REVIEW

**[13]** We next consider: (1) whether the aggravating circumstance is supported by the record in this case; (2) whether the jury recommended the death sentence under the influence of passion, preju-

dice, or any other arbitrary factor; and (3) whether the death sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

The jury found the aggravating circumstance that defendant committed murder "against a law-enforcement officer . . . while engaged in the performance of his official duties." *Id.* § 15A-2000(e)(8). The evidence discussed earlier in this opinion fully supports the aggravating circumstance. In addition, nothing in the record suggests the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Finally, we must determine whether the death sentence was excessive or disproportionate by comparing the present case with other cases in which we have found the death sentence to be disproportionate. *Smith,* 359 N.C. at 223, 607 S.E.2d at 624 (citing *State v. McCollum,* 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied,* 512 U.S. 1254, 129 L. Ed. 2d 895 (1994)). This Court has found the death sentence disproportionate on eight occasions. *State v. Kemmerlin,* 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that defendant's case is not substantially similar to any of these.

Several factors support the determination that the imposition of the death penalty in the present case was neither excessive nor disproportionate. The evidence indicated that defendant had stated shortly before the killing that he wanted to shoot a police officer, that defendant shot Officer Turner, that Officer Turner's weapon was secured in its holster when he was shot, and that defendant fled the scene without offering assistance to the fallen officer. The jury found that the murder was committed against a law enforcement officer while he was engaged in the performance of his official duties, N.C.G.S. § 15A-2000(e)(8), and we have observed that this aggravating circumstance reflects "the General Assembly's recognition that 'the collective conscience requires the most severe penalty for those

who flout our system of law enforcement.' " *Golphin*, 352 N.C. at 487, 533 S.E.2d at 247 (quoting *Brown*, 320 N.C. at 230, 358 S.E.2d at 33).

> The murder of a law enforcement officer *engaged in the performance of his official duties* differs in kind and not merely in degree from other murders. When in the performance of his duties, a law enforcement officer is the representative of the public and a symbol of the rule of law. The murder of a law enforcement officer engaged in the performance of his duties in the truest sense strikes a blow at the entire public—the body politic—and is a direct attack upon the rule of law which must prevail if our society as we know it is to survive.

*Hill*, 311 N.C. at 488, 319 S.E.2d at 177 (Mitchell, J., concurring in part and dissenting in part), *quoted with approval in Guevara*, 349 N.C. at 261, 506 S.E.2d at 723. In addition, the jury found defendant guilty of first-degree murder on the basis of malice, premeditation and deliberation, and we have stated repeatedly that the "finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *judgment vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

Our proportionality review also requires that we compare the case *sub judice* with the cases in which this Court has found the death penalty to be proportionate. *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983). Such review entails an examination of all cases in the pool of "similar cases," but "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164; *accord Golphin*, 352 N.C. at 489, 533 S.E.2d at 248. After carefully considering the circumstances surrounding the murder and the fact that the victim was a law enforcement officer engaged in the performance of his official duties, we believe this case is more similar to cases in which we have found the sentence of death proportionate.

Based upon the foregoing, we conclude that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error.

NO ERROR.

Justices BRADY and NEWBY did not participate in the consideration or decision of this case.