IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-608

Filed 18 June 2024

Mecklenburg County, Nos. 20 CRS 212297, 21 CRS 8901

STATE OF NORTH CAROLINA

v.

DIEGO LEANDER YOUNG

Appeal by Defendant from judgment entered 16 December 2022 by Judge Karen Eady-Williams in Mecklenburg County Superior Court. Heard in the Court of Appeals 24 January 2024.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Gary Adam Moyers, for the State.*

*Irons & Irons, P.A., by Ben G. Irons, II, for Defendant.*

WOOD, Judge.

On 16 December 2022, a jury convicted Diego Young ("Defendant") of being a felon in possession of a firearm. Defendant appeals, arguing the trial court erred in denying defense counsel's request for a special instruction, allowing Troy Walker ("Walker") to testify regarding a pretrial identification of Defendant, and failing to intervene *ex mero motu* during the prosecutor's closing argument. For the reasons stated herein, we hold the trial court committed no prejudicial error.

## I. <u>Factual and Procedural History</u>

On the evening of 21 February 2020, Walker was preparing to leave his apartment in Charlotte, North Carolina to play pool with a friend. While Walker was sitting on the edge of his bed watching TV, he heard a loud crash and saw a black man holding a shotgun and standing at the door. The intruder wore a black baseball cap with the brim pushed down low and a bandana mask over his nose and chin and stretching around his ears. Walker could see the intruder's eyes, the top part of his nose, his brow, and part of his cheeks. The intruder shouted commands such as "stay there, don't move," until he came closer to Walker and made more specific demands, asking where money and jewelry were located. Walker complied with the intruder's commands, handing over his wife's jewelry box, his wedding ring, and his Cuban chain necklace.

Walker stated, "you don't have to kill me" because the intruder was pointing the shotgun at his chest and face. Walker felt strange about this home invasion because where he is from, "these guys, they come in, they take what they want, and leave." Walker was "really concerned" about the intruder and was studying his facial features, mannerisms, body language, and voice to see who he was dealing with and, in case he survived, so that he could do a lineup and recognize the intruder. Walker noticed the intruder's eyes were distinct because they were "really dark, kind of like he wear[s] eyeliner or mascara." The intruder forced Walker to request money from a friend on Cash App, so Walker called the friend with whom he was going to meet to play pool. However, the friend told Walker just to come out and play pool and that

he could give him money then. The intruder became frustrated and told Walker to hang up. He was close enough to Walker to nudge the phone out of his hand.

The intruder told Walker to turn around, get on his knees, and put his hands behind his head. Walker initially thought this would be the last day of his life, but "something else kicked in," and he decided to take action. Walker stood up from the bed, came face-to-face with the intruder, and then lunged, grabbed the gun, pulled it toward him, and elbowed the intruder in the chin. The intruder fell and fired the shotgun, shooting Walker in the arm and stomach. Although injured, Walker struggled for the gun and wrestled it away from the intruder, who then ran out of the apartment.

Using the shotgun as a cane to stand up, Walker attempted to chase after the intruder but became weak, so he knocked on a neighbor's door for assistance. Having heard the commotion, a different neighbor had called the police. The Charlotte Fire Department treated Walker's injuries on the sidewalk. Responding officers recovered the shotgun from Walker's front porch. Walker was transported to a hospital where he was treated and hospitalized for seven days. Walker testified that due to the gunshot injuries, his kidneys and lungs collapsed, and he had to have a portion of his intestines removed, and his arm is now numb. After his discharge, he had to return to the hospital for another seven or eight days because his body was shutting down.

Detective Luke Amos ("Detective Amos"), the lead investigator in the case, identified the owner of the shotgun as Alshonda Robinson ("Robinson"). Detective

Amos spoke with Robinson at her home and learned that she had a relationship with Defendant. According to Detective Amos, Robinson described the nature of her relationship with Defendant as "somewhat confusing." Specifically, he testified at trial, "There may or may not have been some kind of romantic relationship involved, but they were, at minimum, friends."

Detective Amos also investigated the vehicle reported to be involved in the home invasion, a silver Honda. He became aware of the suspect vehicle due to a "BOLO" ("be on the lookout") bulletin that was sent out to officers after the crime occurred. Detective Amos testified he noticed a silver Honda Accord at Robinson's address while he spoke with her at her home.

Subsequent to the home invasion, Walker attempted to search online to determine if the intruder had been arrested. Approximately a week and a half or two weeks after the home invasion, an officer told Walker that Defendant had been arrested and provided Walker with Defendant's name. Walker did not recall exactly which officer gave him Defendant's name, but he believed it was Detective Amos. Walker was told by law enforcement that viewing a photo lineup would not be in his best interest because:

> it can work against you if you go and pick somebody without seeing their face clear[ly] and it's not them . . . . So we didn't do the lineup or the mugshot at that point because of that because they said it wouldn't be smart, it wouldn't help the case, the situation, if I went and saw a mugshot and didn't pick out anyone or if I did pick out the wrong one. So I just excluded the option of a mugshot.

Detective Amos believed he was the one who told Walker that a suspect was arrested, although he did not recall giving Defendant's name to Walker. At trial, he testified why a photo lineup was not conducted in this case:

> Because of the description that was given by [Walker], a hat pulled low and a mask across the face, that's not something that would be viable for us in this situation.
>
> . . .
>
> It would not be practical. It would -- most people, no matter who they are, are not going to be able to pick out just a set of eyes, which is what basically is what he saw during this incident.
>
> . . .
>
> I say "most," I would say almost no one unless it was a person that they already knew, and if they already knew that person, there would be no purpose for a photo lineup.

After being told Defendant's name, Walker searched the name online, found Defendant's picture, and was "100 percent" certain the picture of Defendant portrayed the man who had broken into his apartment. Walker focused on Defendant's eyes and was sure they belonged to the man who broke into his home. However, prior to a detective giving Walker Defendant's name, Walker never told law enforcement that he would be able to identify Defendant by his eyes.

On 25 September 2020, Walker attended Defendant's bond hearing. According to Walker, he immediately recognized Defendant as the intruder even though Defendant wore a mask in the courtroom due to the implementation of COVID-19

procedures. Walker told the prosecutor at the hearing that he recognized Defendant as the person who had invaded his home with a shotgun. The prosecutor, in turn, had Walker provide a statement detailing Walker's identification of Defendant. The statement noted Walker was present at the bond hearing and stated:

> Unsolicited from . . . myself, Mr. Walker commented that when he saw the defendant come into the courtroom they locked eyes and he knew 100% that it was the individual that assaulted him with a shotgun and attacked him. He went on to explain that although the attacker had a mask covering part of his face that night, he could see his eyes and the features around his eyes and during their struggle got a good opportunity to see that part of his face. He was clear that he was 100% sure that the defendant was the person who attacked him that night. The Defendant had also spoken in the courtroom when asked by the Judge questions regarding counsel and Mr. Walker also indicated he had heard the defendant's voice and recognized that voice to be the same voice of his attacker.

On 6 April 2020, a warrant was issued for Defendant's arrest for possession of a firearm by a felon in violation of N.C. Gen. Stat. § 14-415.1. On 15 June 2020, a grand jury indicted Defendant on the same offense. On 14 June 2021, Defendant was separately indicted for attaining habitual felon status pursuant to N.C. Gen. Stat. § 14-7.1. Defendant was also indicted on the charges of first-degree burglary, robbery with a dangerous weapon, and assault with a deadly weapon with intent to kill inflicting serious injury.[1]

---

[1] These indictments do not appear in the Record. However, the trial court included those indictments when it listed the charged offenses. The jury reached a verdict of not guilty on these charges.

Defendant's case came on for trial at the 12 December 2022 criminal session of Mecklenburg County Superior Court. At trial, William Trantham ("Trantham"), a latent fingerprint examiner at the Charlotte Mecklenburg Police Department's crime laboratory, was tendered as an expert in the field of fingerprint analysis without objection. Trantham testified that a latent print is one that is hidden and needs processing to become visible to the human eye. Trantham testified he discovered a latent palm print on the shotgun recovered at Walker's apartment. The palm print was an "AFIS value print," meaning the print "contains sufficient quality and quantity of ridge features that allow it to be searched through" the AFIS ("Automated Fingerprint Identification System") database. Trantham searched the print through the AFIS database, and it returned the top five potential donors, or sources, of the print. Upon closer analysis of the palm print and Defendant's exemplar print, Trantham formed an opinion that they matched.[2] On cross-examination, he testified he could not ascertain from his analysis of the palm print whether it was imprinted the day of the break-in.

During jury deliberations, the jury submitted a note to the trial court in which it asked, "Does the charge Firearm by [a] Felon mean that the defendant cannot even touch a firearm?" In response to the jury's question, the trial court brought the jury

---

[2] Trantham testified that an exemplar print is a "known fingerprint," in other words, "a known reproduction of the friction ridge skin on the palms of the hands. . . . It's an intentional recording of friction ridge skin."

back into the courtroom and reread the pattern jury instructions on possession of a firearm by a felon. The trial court also read the definition of actual possession: "A person has actual possession of an article if the person has it on the person, is aware of its presence, and either alone or together with others has both the power and intent to control its disposition or use."

The jury convicted Defendant of the offenses of possession of a firearm by a felon and of attaining habitual felon status and acquitted Defendant of the remaining charges. Defendant entered oral notice of appeal in open court. Other relevant facts are provided as necessary in our analysis.

## II. <u>Analysis</u>

Defendant argues the trial court erred in: (1) failing to provide a jury instruction stating that a palm print found on the shotgun could only be considered if placed there when the crime was committed; (2) allowing Walker to testify regarding his pretrial identification of Defendant despite the trial court's determination that the pretrial identification procedure was impermissibly suggestive; and (3) failing to intervene *ex mero motu* when the State argued in its closing argument that photos discovered on Defendant's phone depicting him holding firearms were "important evidence."[3] We address each argument in turn.

**A. Jury Instruction Regarding Fingerprints**

---

[3] The trial court excluded the photographs from evidence, though Detective Amos had testified without objection that the photographs depicted Defendant with firearms in his possession.

Defendant argues the trial court erred in failing to give a jury instruction that the jury could only consider "evidence about fingerprints" if the jury found the fingerprints were "found in the place the crime was committed" and were "put there when the crime was committed." The State argues the trial court did not err in denying defense counsel's request for the jury instruction and Defendant failed to preserve this issue for appeal because such a jury instruction constitutes a special instruction and therefore was required to be requested in writing, which defense counsel did not do.

A request for a special instruction which deviates from the pattern jury instruction qualifies as a special instruction. *State v. Brichikov*, 281 N.C. App. 408, 414, 869 S.E.2d 339, 344 (2022); *see also State v. McNeill*, 346 N.C. 233, 239–40, 485 S.E.2d 284, 288 (1997) (defendant's oral request to modify pattern jury instruction for premeditation and deliberation was "tantamount to a request for special instructions"). "In North Carolina, requests for special jury instructions are allowable under N.C.G.S. §§ 1-181 and 1A-1, Rule 51(b) of the North Carolina General Statutes." *State v. McNeil*, 196 N.C. App. 394, 405, 674 S.E.2d 813, 820 (2009). Requests for special instructions *must* be in writing, entitled in the cause, and signed by the counsel or party submitting them. N.C. Gen. Stat. § 1-181(a); N.C. R. Civ. P.

51(b).[4] Rule 21 of the General Rules of Practice for the Superior and District Courts also addresses special instructions, directing that they be submitted in writing, though this rule does not appear to be explicitly mandatory: "If special instructions are desired, they *should be* submitted in writing to the trial judge at or before the jury instruction conference." N.C. Super. Ct. & Dist. Ct. R. 21 (emphasis added).

"This Court has held that a trial court's ruling denying requested instructions is not error where the defendant fails to submit his request for instructions in writing." *McNeill*, 346 N.C. at 240, 485 S.E.2d at 288 ("Defendant here did not submit either of his proposed modifications in writing, and therefore it was not error for the trial court to fail to charge as requested"); *see also Brichikov*, 281 N.C. App. at 414, 869 S.E.2d at 344 ("A request for a culpable omission instruction would be a deviation from the pattern jury instruction, qualify as a special instruction, and would have needed to be submitted to the trial court in writing"); *State v. Martin*, 322 N.C. 229, 236–37, 367 S.E.2d 618, 622–23 (1988) (defendant failed to request special instruction in writing and therefore, the issue was not preserved on appeal, and the trial court

---

[4] We note the mandatory language ("must") is employed in both N.C. Gen. Stat. § 1-181 and N.C. R. Civ. P. 51(b). The State cites N.C. Gen. Stat. § 15A-1231 for the proposition that the statute "governs the procedure for instructing the jury in a criminal case." Specifically, the State quotes from the statute, "At the close of the evidence or at an earlier time directed by the judge, any party may tender written instructions. A party tendering instructions must furnish copies to the other parties at the time he tenders them to the judge." N.C. Gen. Stat. § 15A-1231(a). However, N.C. Gen. Stat. § 15A-1231(a) does not specifically address special instructions; rather, it simply states that at the appropriate time, a party "may" tender written instructions.

did not err in failing to give the requested instruction in the absence of a written request).

Here, during the charge conference, defense counsel stated, "the only other *special instruction* I would ask for is one regarding fingerprint evidence and fingerprints. . . . It's one that was created, so I can read it." (Emphasis added). The prosecutor asked defense counsel, "You said one that was created?" Defense counsel responded, "Uh-huh. *A special jury instruction.*" (Emphasis added). Defense counsel read the requested instruction aloud to the prosecutor and the trial court:

> The prosecutor has introduced evidence about fingerprints. You may consider this evidence when you decide whether the prosecutor has proved beyond a reasonable doubt that the defendant was the person who committed the alleged crime. However, fingerprints matching the defendant's fingerprints must have been found in the place the crime was committed under such circumstances and could only have been put there when the crime was committed.

The prosecutor asked defense counsel, "Where is this?" Defense counsel responded, "[W]e created the special instruction."

Defendant did not submit the request for a special instruction in writing. Therefore, Defendant failed to comply with N.C. Gen. Stat. § 1-181(a) and N.C. R. Civ. P. 51(b).

Defendant argues that "[t]here is no indication that the trial court, the State or defense counsel was confused as to what was being requested." More specifically, Defendant argues that the cases in which our appellate courts have required special

instructions to be submitted in writing, "the content of the instruction requested was debated but never specified." We disagree.

For example, our Supreme Court in *McNeill* did not indicate there was any confusion as to what special instruction defense counsel was requesting: "During the charge conference, defense counsel requested that the trial court delete all of the listed examples of things from which premeditation and deliberation may be inferred." 346 N.C. at 239, 485 S.E.2d at 288 (citing the specific pattern jury instruction which defense counsel sought to modify). The court in *McNeill* then *quoted* other requests for modifications to jury instructions orally requested by defense counsel. *Id.* The court held, "Defendant here did not submit either of his proposed modifications in writing, and therefore it was not error for the trial court to fail to charge as requested." *Id.* at 240, 485 S.E.2d at 288.

In *State v. Augustine*, our Supreme Court noted that the defendant orally requested "a special jury instruction concerning the testimony and credibility of [a] prosecution witness." 359 N.C. 709, 728, 616 S.E.2d 515, 529 (2005). The court in *Augustine* specifically noted that the defendant "requested the trial court to instruct the jury that at the time of the trial, [a witness] could be facing habitual felon status if he were convicted of a pending felony cocaine charge" and that the trial court should instruct the jury on the witness' "potential status so it could determine whether that has an impact on his testimony in that case, whether it makes him interested or not." *Id.* (quotation marks omitted). The trial court denied the defendant's oral request for

the special instruction but agreed to allow defense counsel "to tender an instruction for the record the next court day." *Id.* (quotation marks omitted). However, defense counsel never submitted a written instruction, and our Supreme Court concluded that where "defendant made no such tender[,] . . . we find no error in the trial court's denial of defendant's oral request." *Id.* at 728–29, 616 S.E.2d at 529–30. As in *McNeill*, the court in *Augustine* was not confused about what instruction defense counsel requested.

Accordingly, we conclude that the trial court and the parties having actual knowledge of the contents of a defendant's requested special instruction does not obviate the requirement that a defendant actually submit a request for a special instruction in writing. Defendant's argument hints at the proposition that orally stating the contents of a requested special instruction constitutes substantial compliance with the requirement to submit such a request in writing and therefore should be accepted in place of actual compliance. However, Defendant cites no rule of law or controlling precedents indicating this Court may accept substantial compliance in place of actual compliance, and we decline to do so.

Defendant further argues that where "[t]he purpose of N.C. R. App. [P.] 10(a)(2) was met," this Court should consider a purported error involving jury instruction preserved. Rule 10 of the Appellate Rules of Procedure states in pertinent part:

> A party may not make any portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects thereto before the jury retires to consider its verdict, stating distinctly that to which objection is made and the grounds of the objection; provided that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury.

N.C. R. App. P. 10(a)(2). Defendant cites *State v. Rowe* for the proposition that a request for a jury instruction constitutes an objection, and therefore, requesting a jury instruction preserves the issue for appeal. 231 N.C. App. 462, 752 S.E.2d 223 (2013). Indeed, in *Rowe*, this Court stated, "For the purposes of Rule 10(a)(2), a request for instructions constitutes an objection." *Id.* at 469, 752 S.E.2d at 227. The defendant in *Rowe* specifically requested the trial court to instruct the jury "on the lesser-included offense of simple assault in addition to the crime of assault inflicting serious injury." *Id.* at 468, 752 S.E.2d at 227. The court held that the defendant preserved the issue for appellate review by requesting the jury instruction on the lesser-included offense.

However, this case is distinguishable from *Rowe*. A request for an instruction on a lesser-included offense is not a request for a deviation from a pattern instruction. *Brichikov*, 281 N.C. App. at 414, 869 S.E.2d at 344; *McNeill*, 346 N.C. at 239–40, 485 S.E.2d at 288. We are unpersuaded by Defendant's argument and hold that the trial court did not err in denying Defendant's request for a special jury instruction regarding fingerprints where he failed to submit such a request in writing. *McNeill*,

346 N.C. at 240, 485 S.E.2d at 288; *Brichikov*, 281 N.C. App. at 414–15, 869 S.E.2d at 344; *Martin*, 322 N.C. at 236–37, 367 S.E.2d at 622–23.

Even if we were to overlook the failure to request the special instruction in writing, we disagree with Defendant's argument that the requested instruction is a correct application of the law to the facts of this case. When a defendant submits an oral request for a special instruction, "it is within the discretion of the court to give or refuse such instruction." *State v. Harris*, 67 N.C. App. 97, 102, 312 S.E.2d 541, 544 (1984). Even if a trial court abuses its discretion in denying such a request, a defendant "is entitled to a new trial only if there is a reasonable probability that, had the abuse of discretion not occurred, a different result would have been reached at trial." *State v. Mewborn*, 178 N.C. App. 281, 292, 631 S.E.2d 224, 231 (2006).

Here, the prosecutor objected to defense counsel's request for the special instruction regarding fingerprints. The trial court asked the prosecutor if she wished to be heard on defense counsel's request, and the prosecutor replied:

> The State absolutely objects to that, Your Honor. It implies that the only way the fingerprints could be considered is some belief that it was put there at the time. That's not necessary to prove the case. It's not necessary that the fingerprints happened there, just like it's not necessary that DNA ends up on a T-shirt that's now placed somewhere. So the State would object to that instruction.

The trial court sustained the prosecutor's objection and denied defense counsel's request for the special instruction.

The requested special instruction would have prohibited the jury from considering Defendant's palm print as evidence that Defendant "was the person who committed the alleged crime" unless the jury found that the fingerprints were "found in the place the crime was committed under such circumstances and could only have been put there when the crime was committed." Although Defendant argues that without this instruction, it was not "clear that the fingerprints had to be placed on the gun on February 21, 2020 as charged in the indictment and as Mr. Walker alleged," it is not at all clear that defense counsel intended the instruction to pertain specifically to the charged offense of felon in possession of a firearm. During the colloquy on the matter, defense counsel did not specify the offense to which she wished the instruction to be applied. Again, the requested special instruction states:

> The prosecutor has introduced evidence about fingerprints. You may consider this evidence when you decide whether the prosecutor has proved beyond a reasonable doubt that the defendant was the person who committed the alleged *crime*. However, fingerprints matching the defendant's fingerprints must have been found in the place the *crime* was committed under such circumstances and could only have been put there when the *crime* was committed.

(Emphasis added). It is unclear *which* crime the jury was allowed to find Defendant to be the perpetrator of if it found the fingerprints were placed on the shotgun at the place and time the "crime" was committed. It is equally, and perhaps more, reasonable to believe defense counsel intended this instruction to be applied to the offenses of first-degree burglary, robbery with a dangerous weapon, and/or assault

with a deadly weapon with intent to kill inflicting serious injury than felon in possession of a firearm. Understood this way, the instruction would have allowed the jury to use the fingerprint evidence as evidence that Defendant was the perpetrator of the home invasion (and, in turn, the offenses specifically related to the home invasion) only if it found that Defendant placed the palm print on the shotgun at the location and time of the home invasion itself. If that were the case, we could not hold the trial court's denial of the special instruction prejudiced Defendant because the jury did not convict him of those offenses.

Even presuming defense counsel intended the requested instruction to apply to the offense of felon in possession of a firearm, the instruction was not a proper application of the law to the facts of the case. Defendant argues, "There was no admissible evidence that [Defendant] possessed a firearm at any time after June 13, 2014, the last conviction for the third underlying felony, and before February 21, 2020, the date of the charge in the indictment." The indictment for possession of a firearm by a felon states "that *on or about* the 21st day of February, 2020," Defendant possessed a shotgun. (Emphasis added). The date of Defendant's most recent felony is 13 June 2014. Detective Amos testified that Robinson, the original owner of the shotgun, purchased it in 2015. Therefore, Defendant could not have placed his palm print on the shotgun prior to 2015. Trantham testified that he determined the palm print found on the shotgun matched Defendant's exemplar prints, which constitutes substantial evidence tending to show Defendant possessed the shotgun. Moreover,

Defendant had a friendship and possible romantic relationship with Robinson, and Detective Amos observed the vehicle suspected to belong to the perpetrator of the offense near Robinson's home. Admissible evidence tended to show Defendant possessed a firearm after 13 June 2014 and on or before 21 February 2020.

A conviction on the charge of possession of a firearm by a felon was not contingent on a conviction for any of the other charged offenses, nor did the trial court instruct the jury in such a manner. Rather, the trial court instructed the jury that to reach a guilty verdict on the offense of felon in possession of a firearm, it had to find: "First, that the defendant was convicted of a felony in violation of the laws of the State of North Carolina. And second, that after the date of his conviction, the defendant possessed a firearm." Nothing about the manner in which the indictment charged Defendant with the offense nor the manner in which the trial court instructed the jury on the offense required the jury to return guilty verdicts on any other offense in order for it to find Defendant guilty of the felon in possession of a firearm offense. Therefore, the jury was not required to find that Defendant placed his palm print on the shotgun at the location or time of the home invasion. Accordingly, we hold the trial court did not abuse its discretion in denying Defendant's request for a special instruction on fingerprints.

Finally, Defendant argues this Court's opinion in *State v. Bradley* is controlling in this case because this Court awarded a new trial where the trial court denied the defendant's request for "an instruction to the effect that fingerprints corresponding

to those of the accused were without probative force unless the circumstances showed that they could have only been impressed at the time the crime was committed." 65 N.C. App. 359, 363–64, 309 S.E.2d 510, 513 (1983). In *Bradley*, the defendant was charged with felonious breaking and entering and felonious larceny. *Id.* at 360, 309 S.E.2d at 511. The State's evidence tended to show that between 6:00 p.m. and the early morning hours of the next day, "someone" broke into an accounting office. One of the items stolen was a bulky television set which would have required two people to carry. An investigator found a latent print on a broken window at the accounting office, and the State's expert witness found that the palm print on the windowpane matched the defendant's. The expert witness "testified that under ideal conditions, the palm print could have remained on the window for six months." *Id.* at 360–61, 309 S.E.2d at 511.

The court in *Bradley* held, "When a requested instruction . . . is correct in law and supported by the evidence, the Court must give the instruction in substance. The requested instruction in the instant case was a correct application of the law to the evidence." *Id.* at 363, 309 S.E.2d at 513 (citation omitted). The court reasoned that the "State relied primarily on fingerprint evidence to prove defendant's guilt" and that the defendant "was entitled to have the jury instructed on the probative value of such evidence." *Id.*

*Bradley* is distinguishable from the case *sub judice*. For the defendant to be convicted of a larceny that occurred at a particular time and in a particular place, the

defendant was entitled to have the jury make a determination whether or not it believed he was physically present at the time and place the crime occurred. In other words, in order to convict the defendant of breaking and entering and larceny, the jury was required to determine whether he broke the window at the time the charged offenses occurred. Here, the language used in the indictment and in the trial court's instruction on the offense of felon in possession of a firearm did not require the jury to find Defendant was at or in Walker's home at the time he possessed the shotgun. Therefore, as explained *supra*, the jury was not required to convict Defendant of any of the charged offenses pertaining directly to the home invasion; rather, it was entitled to convict Defendant of felon in possession of a firearm even if it did not find that he was present at the time and location of the invasion of Walker's home.[5]

**B. Walker's Testimony Regarding an Out-of-Court Identification of Defendant**

Defendant argues the trial court erred in allowing Walker to testify regarding his out-of-court identification of Defendant because the trial court had ruled that such an identification was so impermissibly suggestive that it prohibited Walker from providing an in-court identification of Defendant.

Our Supreme Court has stated:

> Appellate review of a trial court's denial of a motion to suppress is strictly limited to determining whether the

---

[5] We note the jury could have acquitted Defendant of the offenses related to the home invasion even if it found that Defendant was in the vicinity of Walker's home at the time the home invasion occurred.

trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law. Findings of fact not challenged on appeal are deemed to be supported by competent evidence and are binding on appeal. Even when challenged, a trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.

*Conclusions of law are reviewed de novo and are subject to full review*.

*State v. Tripp*, 381 N.C. 617, 625, 873 S.E.2d 298, 305 (2022) (citations and quotation marks omitted) (emphasis added).

"Identification evidence must be excluded as violating a defendant's right to due process where the facts reveal a pretrial identification procedure so impermissibly suggestive that there is a very substantial likelihood of irreparable misidentification." *State v. Harris*, 308 N.C. 159, 162, 301 S.E.2d 91, 94 (1983); *State v. Hammond*, 307 N.C. 662, 667, 300 S.E.2d 361, 364 (1983); *State v. White*, 307 N.C. 42, 45–46, 296 S.E.2d 267, 269 (1982). In *Harris*, our Supreme Court explained that a trial court must consider "[w]hether a pretrial identification procedure is so suggestive as to give rise to a very substantial likelihood of irreparable misidentification," stating that the determination should be based on "all the circumstances in each case." *Harris*, 308 N.C. at 164, 301 S.E.2d at 95. Even if a pretrial identification procedure is suggestive, "it will be *impermissibly* suggestive only if all the circumstances indicate that the procedure resulted in a very substantial

likelihood of irreparable misidentification." *Id.* (emphasis in original). Specifically,

the court enumerated a non-exhaustive list of five "factors to be considered in

evaluating the likelihood of irreparable misidentification":

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Id.*

In the case *sub judice*, the trial court noted there was a "motion in limine to

prohibit in-court identification of Defendant"[6] and stated that the State and defense

counsel could conduct a *voir dire* of Walker during the trial. During trial, the State

requested the *voir dire* of Walker "as to the issue of ID," and the trial court excused

the jury to allow counsel to conduct the *voir dire.* Without the jury in the courtroom,

Walker testified to law enforcement providing him Defendant's name, searching

Defendant's name online and finding a picture of him, attending Defendant's bond

hearing, identifying him at the bond hearing, and providing a statement to the

prosecutor regarding the identification. The State introduced Walker's statement as

State's Exhibit C ("Exhibit C").

---

[6] The Record does not contain a written motion.

After hearing arguments from counsel on whether Walker should be permitted to make an in-court identification, the trial court questioned the State on the issue and why no lineup was conducted in this case:

> [L]et me ask you this question. You gave me a preview of your case on Monday because the question, at the heart of the case, is identification. And so the question I posed to you is: How was [Defendant] identified as the perpetrator in this case? And I know you mentioned in addition to an identification by the witness, that there was a . . . .
> palm print. And so I believe – you've told me this, but I believe the evidence will likely show that based on the palm print, that's how [Defendant's] name came into being in this case; is that correct?
>
> [THE STATE]: Yes.
>
> THE COURT: So if law enforcement had his name, why didn't they do a photo lineup?
>
> [THE STATE]: Your Honor, I genuinely cannot answer that question.
>
> THE COURT: Because that's the question of the day. If they had the name on this -- from the palm print, wouldn't it make sense to just put [Defendant's] face in the midst of the six or eight, like they typically do, and then present it and let the chips fall where they may?
>
> [THE STATE]: Certainly.
>
> THE COURT: Versus Mr. Walker saying that he was told that they couldn't do a photo lineup because they didn't want to pick the wrong person. Well, that's a good thing. You don't want to pick the wrong person. And so I just don't understand how we got here. I don't think I've ever seen a case where you've been given a name, they know a name of a palm print, they really believe that's a suspect, then why not just put it in a photo lineup and see what happens? I

mean, that's what a lineup is for is to make sure there is no misidentification, make sure that someone's rights aren't trampled, to make sure that they're trying to get it right. And here we are, two years later, so it's not like there was some hurry to get to trial, so I just don't know how we got here. I guess the question is probably for Detective Amos or whomever because I don't know how we end up not doing a photo lineup in a case of such magnitude. Somebody got shot and said he almost died but for a surgery, and so I don't know why there was no follow-up with a photo lineup.

. . .

[THE STATE]: You're raising a question that I don't have an answer for, but what we are addressing is whether or not Mr. Walker's identification has probative value or is unduly prejudicial.

The trial court then noted it had analyzed Defendant's motion in limine as an issue of whether the procedure leading to Walker's pretrial identification of Defendant was so impermissibly suggestive as to lead to a witness's misidentification of the purported perpetrator:

Well, in looking at the case law, knowing that this issue was coming, the issue of in-court identification, you know, does have certain standards that have to be met before the Court can allow the witness to make an in-court identification. . . . [T]his issue arise[s] mostly with photo lineups or show ups, and *not as often with in-court identifications that may have a possibility of misidentification.* And so in my research and reading, the courts will look at what's called the Harris factors to determine whether there is a substantial likelihood of irreparable misidentification. In other words, trying to determine whether a procedure was impermissibly suggestive, and in this case, there really was no procedure because detective just simply gave a name and then Mr. Walker, like any person, he was curious as a victim of a

crime, did as he Googled it or just looked it up and came up with the face that ended up being [Defendant's] face because he was given the name of [Defendant]. There was no, it could be one of ten people, one of whatever, and then he looked it up. He was given only one name, then looked the face up, then saw [Defendant] come in the courtroom for a bond hearing and said, yes, that's him.

(Emphasis added). The State pointed out to the trial court that Walker also testified to looking up other names prior to receiving Defendant's name, to which the trial court responded:

He says, yes [to looking up other names], but what corroborates that? What do I have to tell me that he did that? What says that he looked up five faces, 50 faces, or just one? I don't know. Credibility is always at play. And so I hear what he said, but I really don't have anything that corroborates what he said, and that's my concern.

The trial court made findings regarding the possibility of Walker misidentifying Defendant as the perpetrator, referring to the *Harris* factors, 308 N.C. at 164, 301 S.E.2d at 95:

[T]he Court has to look at five factors to the extent that you're talking about likelihood of misidentification and view of the totality of the circumstances. The first one we have to look at is opportunity of the witness to view the person at the time of the offense, the second thing we have to look at is the witness's degree of attention, the third thing is the accuracy of the witness's prior description of the perpetrator, the fourth thing is the level of certainty demonstrated by the witness at the confrontation, and the fifth thing is the length of time between the crime and the confrontation. In this case, I can clearly find that the witness, Mr. Walker, did have an opportunity to view the perpetrator. He says his attention was focused on the defendant's eyes. I'll skip the third factor. It says accuracy

of the witness's prior description of the perpetrator, third factor. I don't recall hearing any prior description of the perpetrator prior to what he said in court regarding [Defendant] having distinct eyes that appeared to be that of a female or soft eyes or with mascara on I believe he said. The fourth thing is the certainty of the witness at the time of the confrontation. Mr. Walker has said he's 100 percent sure that was him who he encountered the night, the same person who's here today. And then the final thing is the time that has elapsed from the time of crime and confrontation. It's been, I guess, two years since . . . . September 2020 [the date of the bond hearing]. And so I've considered those things, but I'll also have to consider based on totality of the circumstances, the role of law enforcement. It's not a factor that's listed in here, but it needs to be considered because I have to make a finding based on clear and convincing evidence, not beyond a reasonable doubt standard. And the factor so far as accuracy of the witness's prior description, well, there was no prior description that I'm hearing of. The description of the eyes is something that's coming up more recently and the prior descriptions also, in my opinion, *tainted by the fact that law enforcement gave Mr. Walker a name that he subsequently looked up* and then attended the bond hearing and then told the officer and Assistant District Attorney Minton, yes, that's the guy. Only after he was given the name, o*ne name, not five, one name, and then looked it up.* That's highly suggestive, and there is a strong likelihood that he could easily have gotten that wrong because he was only given one name and then subsequent that person comes out with the same name, there is no surprise that he says this is the guy, after learning of the fingerprint on the weapon matching [Defendant] and then attending a bond hearing for [Defendant].

So the Court has concerns that despite the fact that Mr. Walker has said that he's a 100 percent certain that [Defendant] was the perpetrator, that *his level of certainty has been tainted by the fact that he was given a name to highly suggest that it was [Defendant]*. The name of [Defendant] was provided to him. And so I do believe there

is a substantial likelihood of irreparable misidentification if I allow Mr. Walker to come in here and point out [Defendant] as being the assailant. It is -- the process leading up to that identification was unnecessarily suggestive, and therefore, I cannot allow the identification to occur in court.

(Emphasis added). Accordingly, the trial court granted Defendant's motion in limine to exclude an in-court identification of Defendant: "So the motion in limine to exclude -- or a motion to suppress to exclude Mr. Walker's in-court identification of [Defendant] as the perpetrator will be granted."

The State then asked the trial court for clarification regarding its ruling. Specifically, the State asked:

So the Court has already ruled that the witness will not be able to make an in-court identification. Does that also include during the voir dire the victim testified that he was given [Defendant's name], does that include that portion of the testimony as well as to what he was told by police officers?

The trial court responded:

Well, I think that's ultimately going to be corroborated by the fingerprint testimony, so when that comes in, the fingerprint goes back -- or palm print goes back to [Defendant], that he was given the name [of Defendant], and so I'm not excluding that. I am excluding him being able to positively identify him in court as the perpetrator, but whatever he learned that you're going to bring in anyway, I don't have any concerns about that.

. . .

That goes to belief as to who he believed did it, but as to certainty and pointing up and saying, yes, he did it, that's what I cannot --

The State then questioned whether it could ask Walker about his identification of Defendant at the bond hearing. The trial court responded:

You can. And [Defense counsel] will be allowed to cross-examine about the circumstances, which she did on the voir dire.

. . .

If you want to give the -- if you want to make the statement, it needs to be told in its totality as to how he got to that statement. In other words, law enforcement gave him a name, he looked it up. It wasn't based on him telling someone I recognize his eyes, I saw his eyes because that's not what happened. He was given a name, then had a bond hearing, and said that's him.

Defense counsel argued, "It's all tainted and it's prejudicial." The trial court asked the State to clarify how it intended to use the statement, asking, "And so you want to use this statement to present it through . . . Mr. Walker to say that this, essentially, was his statement then, is his statement now, taken down by [the prosecutor at the bond hearing] and adopted by [Walker]." The State responded, "Correct." The trial court then told defense counsel:

[Y]ou'll be in a position to cross-examine the circumstances about this, how this came to be. . . . I mean, I guess what I'm saying is the statement is what it is, but through cross-examination, I don't see what prohibits you and limits you from giving the circumstances around which this statement was provided.

Defense counsel argued, "the Court has already ruled and granted the motion in limine, he shouldn't be able to talk about any of this stuff anyway." Defense counsel further argued Exhibit C constituted hearsay. The trial court responded:

> But it corroborates – it's corroborating what he said here, and so it's a hearsay exception. And I guess what I'm also saying is [your] motion in limine or motion to suppress was to exclude in-court identification of your client as the perpetrator. I've granted the motion, which means he cannot make an in-court identification. That doesn't speak to whatever else Mr. Walker would say regarding why he believes he's the perpetrator, but him saying he is the perpetrator, pointing him out, that is the in-court identification that I'm excluding. But how he came up with the idea that he may be the perpetrator, you're free to explore any of that, but for him to point him out and say with 100 percent certainty, yes, that's the man who did it, I'm not allowing that because of the level of suggestiveness that was involved on the front end before he said any of this, and that's why I said that you're open to cross-examine him as to any of this, how he came up with these ideas that [Defendant] was the perpetrator. But for him to be able to positively identify him in court, based on what I've heard, that's been tainted, and therefore, I will not allow him to do it in court in front of the jury. But if the State wants to go into the question as to why he believes it was him, I didn't exclude that. But to be able to, yes, that's him, that's what's being excluded, the in-court identification. Why he believes that's him, that's one thing, but saying it's him, that's something else.

As for Defendant's argument that an in-court identification by Walker was equally as tainted as his testimony regarding his pretrial identification, the trial court stated:

> He's going to testify that he identified him previously, and this statement corroborates that, but the idea of him coming in today and saying, yes, that is him, I'm not allowing that because that's the basis of the motion is can

> he make an in-court identification during the course of this trial. Has there been a previous in-court identification, no, that's not what this is. That was a bond hearing. That was not before a jury, that was not a statement under oath, it was at a bond hearing.
>
> . . .
>
> And I see it maybe it's tomato/tomato to you, same thing, but it's not an in-court identification. It's a statement he made at the time, and the context to me is very relevant as the circumstances under which he made that statement.

With the trial court having established the parameters of how Walker could testify, the jury re-entered the courtroom, and Defendant testified to: his Internet searches attempting to find out whether the intruder had been arrested; that he was given Defendant's name, searched it online, and recognized the corresponding image as the face he had seen the night of the crime; his attendance at Defendant's bond hearing; and how he gave a statement to the prosecutor at the bond hearing. Specifically, Walker testified that at the bond hearing, he spoke with someone about recognizing a person in the courtroom that day and that he gave a written statement about his "opinion on the defendant, who he was, that it was him that actually assaulted me." The State then sought admission of State's Exhibit C into evidence, and the trial court allowed it, overruling Defendant's objection. The State published Exhibit C to the jury.

The trial court determined the "procedure" of Walker's pretrial identification of Defendant was impermissibly suggestive based mainly on the fact that law

enforcement provided Defendant's name to Walker. Walker, therefore, had one name in mind when he searched online and saw a picture of Defendant. The trial court either did not find as credible Walker's contention that he searched multiple names or, even if Walker did search multiple names, such "procedure" was insufficient to overcome the suggestiveness of Walker being provided only one name by law enforcement and then attending Defendant's bond hearing and communicating his identification to the prosecutor. We note that of the five *Harris* factors, the trial court stated at least two of them weighed in favor of a finding that the pretrial identification procedure did not result in a substantial likelihood of irreparable misidentification: (1) Walker had an opportunity to view the perpetrator during the crime; and (2) Walker was "100 percent" certain Defendant was the perpetrator. *See Harris*, 308 N.C. at 164, 301 S.E.2d at 95 (listing the five factors). However, the trial court determined the most significant problem was that law enforcement provided only one name to Defendant, which likely influenced Walker's belief at the bond hearing that Defendant was the perpetrator.

Next, the parties debate whether there was indeed a State-initiated "procedure" as such. The State argues Walker's pretrial identification cannot really be considered an identification *procedure* because Defendant began searching online of his own accord, attended the bond hearing of his own accord, and approached the prosecutor at the bond hearing of his own accord. Specifically, the State argues, "as the *sine qua non* to [Defendant's] due process claim, a pre-trial identification

procedure by law enforcement or the prosecution did not occur here." However, as the trial court noted, a law enforcement officer provided Defendant's name to Walker, and a prosecutor recorded Walker's statement identifying Defendant as his assailant. The State further argues the trial court did not in fact decide that law enforcement used an unnecessarily suggestive identification procedure. We find this contention impossible to reconcile with the trial court's finding that "the process leading up to that identification was unnecessarily suggestive, and therefore, [the trial court] cannot allow the identification to occur in court." It is particularly relevant, as the State admits, that the State does not appeal the trial court's determination of whether the pretrial identification was impermissibly suggestive, and "[i]t is not the responsibility of this Court to construct arguments for a party." *Foster v. Crandell*, 181 N.C. App. 152, 173, 638 S.E.2d 526, 540 (2007). Accordingly, the propriety of the trial court's ruling on the motion in limine is not before us. Rather, we must determine whether the trial court prejudicially erred in allowing Walker to testify about the pretrial identification that it had found was impermissibly suggestive.

Our Supreme Court has stated explicitly that "[i]dentification evidence *must be excluded* as violating a defendant's right to due process where the facts reveal a pretrial identification procedure so impermissibly suggestive that there is a very substantial likelihood of irreparable misidentification." *Harris*, 308 N.C. at 162, 301 S.E.2d at 94 (emphasis added). In the trial court's ruling on the motion in limine, it found the officer's provision of only one name to Walker:

> *highly suggestive*, and there is a strong likelihood that he could easily have gotten that wrong because he was only given one name and then subsequent that person comes out with the same name, there is no surprise that he says this is the guy, after learning of the fingerprint on the weapon matching [Defendant] and then attending a bond hearing for [Defendant].
>
> So the Court has concerns that despite the fact that Mr. Walker has said that he's a 100 percent certain that [Defendant] was the perpetrator, that his level of certainty has been tainted by the fact that he was given a name to highly suggest that it was [Defendant]. The name of [Defendant] was provided to him. And so I do believe *there is a substantial likelihood of irreparable misidentification* if I allow Mr. Walker to come in here and point out [Defendant] as being the assailant. It is -- the process leading up to that identification was unnecessarily suggestive, and therefore, I cannot allow the identification to occur in court.

(Emphasis added.) Therefore, the trial court did make a finding that the pretrial identification was impermissibly suggestive, leading to a substantial likelihood of irreparable misidentification. Once the trial court made that finding, it was required to exclude the identification evidence which it found was impermissibly suggestive. *Harris*, 308 N.C. at 162, 301 S.E.2d at 94. In other words, the trial court's factual findings did not support its conclusion of law that Walker's testimony regarding pretrial identification was admissible. *Tripp*, 381 N.C. at 625, 873 S.E.2d at 305. Accordingly, we are constrained to hold that the trial court erred in allowing Walker to testify regarding the pretrial identification after finding it to be impermissibly suggestive.

We reach this conclusion notwithstanding the trial court's attempt to differentiate between Walker's pretrial identification of Defendant and an in-court identification. The admission of the written statement identifying Defendant as the person who attacked Walker was a *de facto* in-court identification. Further, although the trial court referred to Defendant's motion as a "motion in limine to prohibit *in-court* identification," the trial court made it clear it was addressing the motion as one attempting to exclude an impermissibly suggestive pretrial identification under *Harris*. The trial court used the specific language from *Harris*, listing the five factors delineated in the case for "evaluating the likelihood of irreparable misidentification." 308 N.C. at 164, 301 S.E.2d at 95. Therefore, we cannot avoid the conclusion that the motion in limine and the trial court's ruling on it triggered the analysis, as well as the possible exclusion of evidence, as required by *Harris*. Accordingly, we are constrained to hold the trial court erred in prohibiting an in-court identification but thereafter allowing testimony about the pretrial identification.

We now address whether the trial court's error was prejudicial error. Defendant argues the testimony regarding Walker's pretrial identification prejudiced him because it is the only evidence besides that of his palm print on the shotgun tending to identify him as the perpetrator.

"A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable

doubt, that the error was harmless." N.C. Gen. Stat. § 15A-1443(b). An error involving an impermissibly suggestive pretrial identification implicates a defendant's federal due process rights. *State v. Juene*, 263 N.C. App. 543, 544–45, 823 S.E.2d 889, 891 (2019). Accordingly, we must determine whether the error was harmless beyond a reasonable doubt.

The State argues any error is harmless beyond a reasonable doubt because there was evidence submitted other than Walker's pretrial identification which links Defendant to possession of the shotgun. Specifically, the State argues the jury would have returned a guilty verdict even without the testimony of Walker's identification of Defendant because: (1) Defendant's palm print was discovered on the shotgun; (2) Defendant knew Robinson, the owner of the shotgun; and (3) Detective Amos observed a vehicle matching the description of the suspect vehicle which was sent out in the BOLO the night of the incident. We agree.

Clearly, the palm print's link to Defendant is the strongest evidence that at some point Defendant had possessed the shotgun. The State's expert witness in fingerprint analysis, Trantham, testified he formed an opinion that the palm print on the shotgun matched Defendant's exemplar print. Specifically, Trantham explained that upon his original search of the latent palm print in the AFIS database, the database returned results for "the top five potential donors." Trantham determined that Defendant's exemplar print needed further comparison with the latent palm print. Therefore, he more closely analyzed Defendant's exemplar print. Comparing

Defendant's exemplar print to the latent palm print discovered on the shotgun, Trantham formed an opinion that they originated from the same source—Defendant. Upon cross-examination, Trantham noted that an analysis of the latent palm print did not reveal on what precise date Defendant imprinted his palm print on the shotgun.

Trantham's testimony that the palm print on the shotgun matched Defendant's exemplar print is substantial evidence, separate and apart from Walker's identification of Defendant as the perpetrator of the home invasion, that Defendant possessed the shotgun. The fact that Defendant's palm print was imprinted on the shotgun constitutes evidence that he possessed or held the shotgun at some point. This is true even though Trantham conceded he could not tell when Defendant left his palm print on the shotgun. The indictment for felon in possession of a firearm alleges Defendant possessed the shotgun "*on or about* the 21st day of February, 2020." (Emphasis added). In accordance with the indictment, the trial court did not instruct the jury that it was required to find Defendant possessed the shotgun on 21 February 2020, the date of the home invasion.[7] The trial court instructed the jury that it had

---

[7] We note that for every other charged offense, the trial court instructed the jury that it was required to return a conviction if it found "from the evidence beyond a reasonable doubt that *on or about the alleged date*," the Defendant committed the charged offense. (Emphasis added). Instead of including such language in its instruction on the offense of felon in possession of a firearm, the trial court instructed, "If you find from the evidence beyond a reasonable doubt that the defendant was convicted of a felony that was committed in violation of the laws of the State of North Carolina, and that the defendant, after February 21, 2020, possessed a firearm, it would be your duty -- I'm sorry, *after June 13, 2014, possessed a firearm*, it would be your duty to return a verdict of guilty." (Emphasis added).

to find two elements existed in order to convict Defendant of feloniously possessing a firearm: "First, that the defendant was convicted of a felony in violation of the laws of the State of North Carolina. And second, that after the date of his conviction, the defendant possessed a firearm." Therefore, given the testimony at trial—that Defendant, on an unknown date in or after 2015, imprinted his palm print on the shotgun—the jury had substantial and convincing evidence allowing it to convict Defendant for feloniously possessing a firearm.

Moreover, although the evidence that Defendant imprinted his palm print on the shotgun is the *strongest* evidence he possessed it, it is not the *only* such evidence. Circumstantial evidence also links Defendant to possession of the shotgun. Detective Amos testified that Robinson was the original purchaser of the shotgun, and that Robinson and Defendant were, at a minimum, friends, and may have been involved in a romantic relationship. Detective Amos further testified that while he was speaking with Robinson at her home, he noticed a silver Honda Accord, the vehicle suspected to belong to the perpetrator of the home invasion, at or near Robinson's address. Detective Amos' testimony serves as independent evidence, apart from Walker's identification of Defendant, linking Defendant with possession of the shotgun. The logical connection is that Defendant could have obtained, or in some manner taken, the shotgun from Robinson. Furthermore, although the jury acquitted Defendant of all other charged crimes, the jury could have believed that because Defendant had a relationship with Robinson, he could have had access to the car

suspected to belong to the perpetrator of the home invasion because of his palm print on the shotgun and the location of the vehicle near Robinson's home.

Although Walker's identification of Defendant may have been prejudicial to the other charged crimes of first-degree burglary, robbery with a dangerous weapon, and assault with a deadly weapon with intent to kill inflicting serious injury, the jury acquitted Defendant of those charged offenses.

Walker identified Defendant as the intruder of his home and as the one who had robbed and assaulted him. Clearly, the jury either did not find Walker's identification of Defendant as the perpetrator credible, or it retained a reasonable doubt that Defendant was the perpetrator of those crimes. It is not this Court's duty to determine why the jury would have convicted Defendant for feloniously possessing a firearm but not guilty of the other charged crimes. *See State v. Mumford*, 364 N.C. 394, 399, 699 S.E.2d 911, 915 (2010) ("verdicts cannot be upset by speculation or inquiry into" how juries reach a verdict). Substantial evidence apart from Walker's identification of Defendant supported the jury's guilty verdict for the offense of feloniously possessing a firearm.

Accordingly, we are satisfied that the trial court's error in prohibiting Walker from identifying Defendant in court yet allowing Walker to testify regarding his pretrial identification was harmless beyond a reasonable doubt in light of other substantial evidence demonstrating Defendant feloniously possessed a firearm. *See* N.C. Gen. Stat. § 15A-1443(b).

## C. The Prosecutor's Closing Argument

Defendant argues the trial court erred by failing to intervene *ex mero motu* during the prosecutor's closing argument. Defendant contends the trial court should have intervened when the prosecutor mentioned that photographs from Defendant's cellphone showing him holding a firearm were "important evidence," even though the trial court had prohibited the prosecutor from showing the photographs to the jury and entering them into evidence.

When a party makes allegedly improper closing arguments without provoking an objection, our standard of review when assessing the remarks is whether they

> strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.

*State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002). In determining whether an argument is grossly improper, appellate courts consider "the context in which the remarks were made, as well as their brevity relative to the closing argument as a whole." *State v. Taylor*, 362 N.C. 514, 536, 669 S.E.2d 239, 259 (2008) (citation omitted). We will not "review the exercise of the trial judge's discretion in controlling jury arguments unless the impropriety of counsel's remarks is extreme and is clearly calculated to prejudice the jury in its deliberations." *State v. Taylor*, 289 N.C. 223, 227, 221 S.E.2d 359, 362 (1976). Further, "[i]t is not enough that the prosecutor's

remarks were undesirable or even universally condemned." *State v. Huey*, 370 N.C. 174, 180, 804 S.E.2d 464, 471 (2017) (quotation marks omitted).

Even if a closing argument is grossly improper, the effect of it also must be prejudicial. A defendant is required to demonstrate that "the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. Specifically, defendant has the burden to show a reasonable possibility that, had the error[ ] in question not been committed, a different result would have been reached at trial." *State v. Goins*, 377 N.C. 475, 478, 858 S.E.2d 590, 593 (2021) (citation and quotation marks omitted).

At trial, Detective Amos testified that when Defendant was arrested in connection with the invasion of Walker's home, he had a cellphone in his possession. Detective Amos obtained a search warrant and searched the device for text messages, photographs, social media posts, or any other information "that might be related to guns and/or robberies." Detective Amos found several photographs of firearms, with and without Defendant in them. The prosecutor then sought to admit the photographs into evidence for the stated purpose of highlighting Defendant's height and weight at the time the photographs were taken. Specifically, the prosecutor sought to corroborate Detective Amos' testimony that the photographs were taken in March 2020, which in turn would corroborate Walker's testimony regarding what Defendant looked like at the time the alleged crimes occurred.

The trial court concluded that although some of the information from the photographs might be relevant, they were more prejudicial than probative. The trial court reasoned that although it might be possible to ascertain someone's weight from a photograph, it is not possible to tell someone's height without some sort of reference to height in the photograph. Further, the trial court stated that the photograph of Defendant shirtless with a firearm was irrelevant because the firearm in the photograph was not the shotgun alleged to have been used in the charged offenses. The trial court did not allow the photographs into evidence, preventing the prosecutor from submitting them to the jury.

In her closing argument, the prosecutor told the jury:

> When [Detective Amos] searched the defendant's phone and found pictures of him, this further bolstered his belief because he testified he saw pictures of the defendant with a gun, and he saw pictures of the defendant. I think that's important. He saw pictures of the defendant, and he already has a general idea of his height and weight. He's looking at pictures of the defendant and still does not believe that there's any issues with what the victim said and what he's looking at.

Defendant cites N.C. Gen. Stat. § 15A-1230, which states, "[d]uring a closing argument to the jury an attorney may not . . . make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice." N.C. Gen. Stat. 15A-1230(a). Defendant argues that because the trial court excluded the photographs from Defendant's phone for having more prejudicial than probative effect, information about the photographs also should have been excluded

from the closing argument. Defendant further argues that the inclusion of this information in the prosecutor's closing argument was prejudicial to Defendant because the prosecutor's remarks on the photographs allowed the jury to believe that it could consider the photographs as evidence, even though the trial court had excluded them earlier.

The State argues that the identification of Defendant was a contested issue throughout the course of the trial. Specifically, the State argues that although the photographs were excluded from evidence, Detective Amos already had testified that he found photographs of firearms on Defendant's cellphone, some with and some without Defendant depicted in them. Defense counsel did not object to his testimony about the photographs. Moreover, Detective Amos testified about the contents of the photographs before the trial court ruled that the prosecutor could not admit them into evidence due to their potential prejudicial effect outweighing their probative value. During her closing argument, the prosecutor referenced the photographs from Defendant's phone as supporting Detective Amos's—and by extension, Walker's— credibility on the issue of Defendant matching the description given by Walker. Although the prosecutor should not have implied that the jury could consider the contents of the photographs in corroborating Walker's testimony regarding Defendant's physical appearance at the time of the home invasion, the evidence was already admitted without objection through the testimony of Detective Amos.

Because the prosecutor was referring to testimony already in evidence, admitted without objection, there was a basis for the prosecutor's arguments.

We hold that the prosecutor's remarks were not so grossly improper as to require the trial court to intervene *ex mero motu*, and therefore, the trial court did not err in failing to so intervene. Thus, we need not conduct a prejudice analysis.

### III. <u>Conclusion</u>

The trial court did not err in denying Defendant's request for a special jury instruction regarding fingerprints where he failed to submit such a request in writing. Further, the requested jury instruction was an incorrect application of the law to the facts of this case.

After the trial court determined Walker's pretrial identification of Defendant was impermissibly suggestive, it erred in allowing him to testify regarding the identification. However, the State carried its burden in demonstrating such error was harmless beyond a reasonable doubt due to the other substantial evidence which the jury most likely used to convict Defendant of the offense of felon in possession of a firearm.

Finally, we hold the trial court did not err in failing to intervene *ex mero motu* during the prosecutor's closing argument.

Having considered all of Defendant's arguments, we hold Defendant received a fair trial, free from prejudicial error.

NO PREJUDICIAL ERROR.

Judges TYSON and STADING concur.