IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-688

Filed 4 June 2025

Wake County, Nos. 21CR213322-910; 21CR213323-910; 22CR002505-910

STATE OF NORTH CAROLINA

v.

RAYMOND DERRICK ARRINGTON

Appeal by Defendant from judgments entered 6 November 2023 by Judge Paul C. Ridgeway in Wake County Superior Court. Heard in the Court of Appeals 26 February 2025.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Lindsay Vance Smith, for the State-Appellee.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Emily Holmes Davis, for Defendant-Appellant.*

COLLINS, Judge.

Defendant Raymond Derrick Arrington appeals from judgments entered upon guilty verdicts of first-degree murder and possession of a firearm by a felon, and upon his guilty plea to having attained habitual felon status. Defendant argues that the trial court erred by failing to intervene ex mero motu during the State's closing argument. We find no error.

## I. Background

Defendant was indicted on 13 September 2021 on the charges of murder and

possession of a firearm by a felon. On 25 October 2022, Defendant was indicted for having attained habitual felon status. Defendant's case came on for jury trial on 30 October 2023 and concluded on 6 November 2023. The evidence at trial tended to show the following:

At approximately 10:26 p.m. on 9 August 2021, law enforcement officers with the Raleigh Police Department responded to 911 calls reporting a shooting near 1204 Boyer Street in Raleigh, North Carolina. Upon arriving at the scene, officers found Robert Taylor on the ground and receiving CPR by paramedics; Taylor was unresponsive after having been shot five times. Taylor was transported by ambulance to the hospital, where he ultimately died as a result of the gunshot wounds. Following an investigation into Taylor's death, officers concluded that they had probable cause to arrest Defendant for Taylor's murder.

Officers discovered that, approximately eight months prior to the shooting, Taylor had robbed Defendant; during the robbery, Defendant sustained a "bleeding" "gash" wound to the head and was "angry" about the incident. The night before the shooting, Defendant went to Boyer Street in search of Taylor. Defendant could not find Taylor, but he encountered Zachary Sanders. Defendant asked Sanders where Taylor was, and Sanders replied that Taylor had just left. Defendant "walked to his car, came back with a rifle[,]" and stated, "Man, I'm going to ask you one more time. I know you all are hiding him out here. Now, where is he at?" Sanders again told Defendant that Taylor was not there and had just left; Defendant brandished the rifle

that he was carrying and replied, "Well, when you see him again, tell him he's a dead man."

Sanders saw and spoke with Taylor the following morning. Sanders told Taylor about the encounter with Defendant, stating, "You need to stop coming on Boyer. You need to get low for a while, get out of sight . . . I'm telling you now, you need . . . to stay off Boyer." Taylor said that Defendant was "scared of [him]" and Sanders replied, "[Defendant] ain't scared of you. I'm telling you something for your own good, stay off Boyer."

Later that evening, Sanders witnessed someone shoot Taylor shortly after he parked his car on Boyer Street. Taylor and his girlfriend parked his car in front of 1204 Boyer Street, and his girlfriend decided to nap in the backseat while Taylor stepped out of the car to talk with a friend. Sanders was standing across the street from Taylor when he heard gunshots and heard Taylor "grunt twice." Sanders heard more gunshots and Taylor "grunted twice more[,]" and he "figured [Taylor] got hit two more times." Sanders watched Taylor run across the street towards him, up a driveway, and behind the house next door to Sanders. Sanders then saw a shooter in the street, wearing a mask, who then disappeared.

Sanders testified that, when the first shots rang out, Taylor was standing in front of his car; because of Taylor's positioning, the shooter "had to be laying" in the woods on the other side of Taylor's car when the shots were fired. Sanders testified that the gun used by the shooter was the "same size" and the "same rifle" as the one

that Defendant brandished in front of him the day before.

The State's forensic investigators concluded that eleven shell casings retrieved from the scene of the shooting all came from the "same firearm" – a .22 caliber "long rifle." Investigators also concluded that the shots had all been fired from the direction of a set of trash cans near 1204 Boyer Street, the house in front of which Defendant had parked his car. The State presented detailed call records from Defendant's cell phone which showed that he was on Boyer Street at the time of the shooting. Specifically, the call records showed that, at 10:04 p.m., Defendant traveled from his home towards the area of Boyer Street; at 10:21 p.m., just before the shooting occurred, Defendant's phone registered in the immediate vicinity of Boyer Street. At 10:25 p.m., Defendant's phone began traveling away from Boyer Street and back towards Defendant's home, arriving back at his home at 10:55 p.m.

Defendant's girlfriend, Britney Johnson, took the stand and testified that, upon his arrival home at approximately 10:55 p.m., Defendant told her that she should turn on the news because "somebody [was] shot, found dead on Boyer Street[.]" When asked whether Defendant told her that he murdered Taylor, Johnson testified, "Yeah, I just said I didn't remember verbatim what he said, but basically he did say he did it." When asked if she knew that Defendant had committed the murder of Taylor, Johnson testified, "I did." Johnson stated that Defendant "killed" Taylor "[be]cause of their past issue" with "the gash on his head" that took place approximately eight months prior. Johnson further testified that she knew

Defendant had committed the murder when she was interviewed by detectives, but that she was not honest with them at that time because she "was in love and stupid and just making bad decisions." Johnson also admitted to providing a false cell phone number to detectives because she was "trying to protect [Defendant]."

Following the presentation of the State's evidence, the jury heard closing arguments from the prosecutor; at no point during the State's closing arguments did Defendant object to any portion of the prosecutor's arguments. The jury found Defendant guilty of first-degree murder and possession of a firearm by a felon, and Defendant pled guilty to having attained habitual felon status. The trial court sentenced Defendant to life in prison without parole for the first-degree murder conviction, and it sentenced him as a habitual felon to a concurrent term of 88 to 118 months in prison for the possession of a firearm by a felon conviction. Defendant gave proper oral notice of appeal.

## II.    Discussion

Defendant argues that the trial court committed reversible error by failing to intervene ex mero motu when the prosecutor stated in closing arguments that Sanders told the jury the truth, that Sanders did not lie, and that Sanders was the most credible witness who testified at trial.

"The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to

intervene *ex mero motu*." *State v. Jones*, 355 N.C. 117, 133 (2002) (citation omitted).

To establish such error, "defendant must show that the prosecutor's comments so

infected the trial with unfairness that they rendered the conviction fundamentally

unfair." *State v. Anthony*, 354 N.C. 372, 423 (2001) (citation omitted). This Court

will grant relief "[o]nly when it finds both an improper argument and prejudice[.]"

*State v. Huey*, 370 N.C. 174, 179 (2017) (citation omitted).

N.C. Gen. Stat. § 15A-1230 provides that, during a closing argument to the

jury,

> an attorney may not become abusive, inject his personal
> experiences, express his personal belief as to the truth or
> falsity of the evidence or as to the guilt or innocence of the
> defendant, or make arguments on the basis of matters
> outside the record except for matters concerning which the
> court may take judicial notice. An attorney may, however,
> on the basis of his analysis of the evidence, argue any
> position or conclusion with respect to a matter in issue.

N.C. Gen. Stat. § 15A-1230 (2023). Our Court has further explained that an attorney

may not make statements that "place before the jury the personal beliefs or

knowledge of counsel which are not supported by evidence presented at trial." *State

v. Craig*, 308 N.C. 446, 462 (1983) (citations omitted). However, this Court has long

held that "prosecutors are allowed to argue that the State's witnesses are credible" in

order to "giv[e] the jury reasons to believe the State's evidence[.]" *State v. Augustine*,

359 N.C. 709, 725 (2005) (citation omitted); *see State v. Wiley*, 355 N.C. 592, 621-22

(2002) (a prosecutor's statements to the jury that a witness "pretty much told the

truth" and that "he's told the truth" were not improper).  A prosecutor's statement regarding a witness's truthfulness that relates to the evidence presented is thus not improper because it "merely giv[es] the jury reasons to believe the state's witnesses . . . ." *Id.* at 622 (citations omitted).  Additionally, a prosecutor's statement made during closing argument "should not be viewed in isolation but must be considered in the context in which the remarks were made and the overall factual circumstances to which they referred." *Augustine*, 359 N.C. at 725-26 (cleaned up).

Applying these principals here, we determine that the two challenged statements made by the prosecutor did not stray outside the bounds of proper argument.  The prosecutor first told the jury that

> [Sanders] . . . was the most credible witness that testified in this trial.  He said -- He told you how it is.  [Sanders] gave you specific details.  I want you to remember that when I was questioning [Sanders], I never approached him with shell casings.  I never asked him about the physical evidence.  But did you notice how everything that he said matched up with all of the physical evidence?

The prosecutor then said:

> [Sanders] told you the truth.  And [he] never lied.  Let's make that clear.  He told you, "I didn't want to be involved." He never gave a statement.  He didn't want to talk to Detective Morgan.  While we wish he would have, he didn't. He never lied.  He told you all the truth.

These statements were made in the context of the prosecutor's arguments to the jury that Sanders' testimony was credible because specific portions of his testimony matched the physical evidence presented in the case.  As in *Wiley*, the prosecutor here

was not impermissibly "vouching" for Sanders, but instead "was merely giving the jury reasons to believe the state's witness[]" by arguing Sanders' truthfulness. *Id.* at 622 (citations omitted).

Defendant relies on *State v. Phillips*, 365 N.C. 103 (2011), and *State v. Locklear*, 294 N.C. 210 (1978), to argue that the prosecutor's statements here were improper and prejudicial. However, these cases are distinguishable from the present facts. In *Phillips*, our Supreme Court determined that the prosecutor's statement that an expert witness was "wholly unbelievable" was an improper "flat statement" of the prosecutor's personal belief. *Id.* at 139. In *Locklear*, our Supreme Court determined that the prosecutor's statement, "[Y]ou are lying through your teeth and you know you are playing with a perjury count[,]" was improper because the prosecutor was "assert[ing] his opinion that a witness [was] lying." *Id.* at 217. However, the Court explained that the prosecutor could have "argue[d] to the jury that they should not believe a witness, but he should not call him a liar." *Id.* (citation omitted).

In both *Phillips* and *Locklear*, the prosecutors' improper remarks were flat statements of their personal beliefs and, unlike here, the statements were not made in the context of providing the jury reasons to believe a witness's testimony because specific portions of the testimony matched the physical evidence presented by the State. Moreover, even if we were to assume that the prosecutor's statements about Sanders' truthfulness were improper, Defendant has failed to demonstrate prejudice

by showing how these statements "infected the trial with unfairness and thus rendered the conviction fundamentally unfair." *State v. Carroll*, 356 N.C. 526, 537 (2002) (citation omitted).

### III.    Conclusion

Because the prosecutor's statements were not improper, the trial court did not commit reversible error by failing to intervene ex mero motu during the State's closing arguments.

NO ERROR.

Judges ZACHARY and GORE concur.